FILED

OCT 25 2021

CLERK U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

1  Kurt L. Hudson
   441 E. 87th Place
2  Chicago, IL 60619
   Telephone: (312) 391-3339
3  kh@khudsonlaw.com

4  Pro Se Plaintiff

5

6

7        UNITED STATES DISTRICT COURT FOR THE
8            NORTHERN DISTRICT OF CALIFORNIA

                                                    KAW

9  Kurt L. Hudson, individually and on behalf   )
   of all others similarly situated,            )   CV 21 8296
10                                               )
                                                 )   Case No.
        Plaintiff,                               )
11                                               )
                                                 )   **CLASS ACTION COMPLAINT**
   v.                                            )
12                                               )   **DEMAND FOR JURY TRIAL**
                                                 )
13 Wells Fargo & Company and Wells Fargo         )
   Bank, N.A.,                                   )
14
        Defendant.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

Page

I. INTRODUCTION.................................................................................................................. 1

II. JURISDICTION ................................................................................................................. 2

III. INTRADISTRICT ASSIGNMENT .................................................................................. 3

IV. PARTIES .............................................................................................................................. 3

V. FACTUAL ALLEGATIONS.............................................................................................. 3

    A.    Background on Wells Fargo ........................................................................................ 3

    B.    The Federal HAMP Program ...................................................................................... 7

    C.    Wells Fargo's Proprietary Software Miscalculates "Net Present Value," Wrongly Denying Mortgage Modifications to Borrowers.................................................................. 9

    D.    Wells Fargo's Miscalculation Errors and Resulting Foreclosures Caused Class Members Substantial Financial and Other Harm.................................................................. 11

    E.    Prior Litigation Involving Plaintiff And His Mortgage With Wells Fargo ...................... 17

VI. CLASS ALLEGATIONS ................................................................................................... 19

VII. CHOICE OF LAW ALLEGATIONS................................................................................ 21

VIII. TOLLING ALLEGATIONS .......................................................................................... 23

FIRST CAUSE OF ACTION Negligent and Gross Negligence Breach of Contract........................ 24

SECOND CAUSE OF ACTION Violation Of California's Unfair Competition Law ("UCL") ................................................................................................................................. 27

THIRD CAUSE OF ACTION Violation Of Florida's Deceptive And Unfair Trade Practices Act........................................................................................................................... 30

FOURTH CAUSE OF ACTION Violation Of Florida's Unauthorized Practice Of Law Statute ................................................................................................................................... 34

FIFTH CAUSE OF ACTION Breach Of Fiduciary Duty ................................................................. 37

SIXTH CAUSE OF ACTION Fraudulent Concealment ................................................................... 42

SEVENTH CAUSE OF ACTION Fraud On The Florida State And Appellate Courts................. 46

EIGHT CAUSE OF ACTION Concealment Fraud And The California and Iowa Federal Courts...................................................................................................................................... 50

PRAYER FOR RELIEF/FIRST THROUGH EIGHT CAUSES OF ACTION ............................... 51

**NINTH CAUSE OF ACTION Revival of Plaintiff's And SubClass Members' Rico Complaint** ........................................................................................................................................ 52

**EXHIBIT 1 The Real Wells Fargo, U.S House of Representatives, Majority Staff Report, March 2020** .............................................................................................................................. 74

**EXHIBIT 2 Deferred Prosecution Agreement, February 20, 2020** ...................................................... 75

CLASS ACTION COMPLAINT

# I.    INTRODUCTION

1.    Losing your home through foreclosure is the most disruptive financial and emotional event that an individual can experience.

2.    Recognizing this, Congress set aside $50 billion in stimulus funding for the Home Affordable Modification Program (HAMP).  Created in the wake of the mortgage crisis, HAMP was designed to keep people in their homes, providing a measure of stability to homeowners facing unemployment, disability or other financial hardships.

3.    Wells Fargo accepted up to $6.4 billion in HAMP funding, but failed to fulfill its obligations and duties to its customers and beneficiaries under HAMP's loan modification program.

4.    Rather than use software developed by Fannie Mae to calculate a borrower's eligibility for HAMP, Wells Fargo and its vendor Black Night, developed its own proprietary tool.  Wells Fargo now admits that this tool caused systematic miscalculations that led to Wells Fargo wrongfully denying loan modifications to over 870 borrowers who qualified for a loan modification under HAMP.  Of those, Wells Fargo admits it foreclosed on 545 borrowers when it should have instead offered them a loan modification.

5.    Loan modifications often substantially reduce borrower's monthly payments.

6.    Plaintiff, Kurt L. Hudson, was the exact type of person whom HAMP was supposed to help.  In 2005, he was working full-time and bought a retirement condo in Hillsboro Beach, Florida.

7.    When the recession hit, however, he was forced to retire early and move to Florida because of medical and other financial hardship reasons and needed the help that HAMP was supposed to provide.

8.    Rather than extend a HAMP modification, Wells Fargo miscalculated it and initiated foreclosure proceedings in 2015.  Mr. Hudson fought foreclosure pro se for years, all the way to the

1    appellate court in Florida but his retirement home was eventually foreclosed on first by the

2    Condominium Association and then 4 months later by Wells Fargo.

3    9.    As part of its voluntary remediation program—designed to reassure investors and the

4    public that Wells Fargo can be a trusted brand once again—Wells Fargo has sent checks of up to

5    $25,000 to some but has not contacted Mr. Hudson or sent him a check. The accompanying letters to

6    others state that Wells Fargo had discovered that they were not offered a loan modification due to a

7    faulty computer program calculation and if not for the error, they would have been approved for a

9    HAMP modification.

10    10.    Wells Fargo's letters did not give details about the error or explain how Wells Fargo

11    determined the amounts offered by its checks, but, nonetheless, assured that the checks should be

12    sufficient to make things right.

14    11.    Seeking full and fair compensation, Plaintiff brings this action on behalf of himself and

15    others similarly affected by Wells Fargo's faulty modification calculations but who have not been

16    contacted by Wells Fargo or who were not advised or notified previously of the substantial computer

17    errors made by Wells Fargo and its computer program. Wells Fargo intentionally and knowingly

18    concealed the wrongful calculations from Plaintiffs and the public for several years and only disclosed

19    in its SEC filings because government regulators were knocking on its door

## II.    JURISDICTION

12.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2)

because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000,

exclusive of interest and costs, there are 1,152,000 Members plus Plaintiff estimated to be in the

proposed class, and at least one member of the class of plaintiffs is a citizen of a state different from the

Defendant.

CLASS ACTION COMPLAINT
kh@khudsonlaw.com

13.     This Court has personal jurisdiction over Defendants Wells Fargo & Co. and Wells Fargo Bank, N.A. because they are headquartered in California and they both conduct substantial business in the State of California.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District.

### III.     INTRADISTRICT ASSIGNMENT

15.     Assignment to the Oakland/San Francisco division is proper because Wells Fargo, does substantial business in San Francisco, California and a substantial part of the events or omissions which give rise to the claims occurred there and other relevant or related class action matters are pending in San Francisco.  See Case No. 3:18-CV-07354-WHA.

### IV.     PARTIES

16.     Plaintiff, Kurt L. Hudson, is a current resident of Illinois, who owned a retirement home and resided in Florida during the relevant time period.

17.     Defendant Wells Fargo & Company is incorporated in Delaware, and its principal place of business is 420 Montgomery Street, San Francisco, California 94104.  Defendant Wells Fargo Bank, N.A. is a banking subsidiary of Defendant Wells Fargo & Company with its principal place of business and corporate offices at 420 Montgomery Street, San Francisco, California 94104.

### V.     FACTUAL ALLEGATIONS

**A.     Background on Wells Fargo**

18.     Wells Fargo has historically been the nation's largest mortgage lender.  That lasted until a string of scandals stemming from Wells Fargo's misdeeds started coming to light in 2017.[1]  According

---

[1] Samantha Sharf, *Quicken Loans Overtakes Wells Fargo As America's Largest Mortgage Lender,* FORBES (Feb. 5, 2018), https://tinyurl.com/largest-lender.

CLASS ACTION COMPLAINT

kh@khudsonlaw.com

to Wells Fargo's quarterly filing for September 30, 2018 with the Securities & Exchange Commission (SEC), the bank holds \$284 billion in mortgage debt, and another \$36 billion on second-mortgages.[2]

19.     At the end of 2016, federal regulators revealed that Wells Fargo's employees had "secretly created millions of unauthorized bank and credit card accounts without their customers knowing it."[3]

20.     In July 2017, the *New York Times* revealed that Wells Fargo had charged more than 800,000 borrowers for "force-placed" car insurance that they did not want or need.[4]  The bank was only allowed to charge for "force-placed" insurance if the car-loan customer did not have their own auto insurance, but these customers *did* have their own insurance.[5]  The *New York Times* reported that 25,000 Wells Fargo borrowers had their vehicles wrongfully repossessed as a result of Wells Fargo adding these additional premium amounts for the force-placed insurance to consumers' monthly loan statements.[6]

21.     In April 2018, federal regulators settled an enforcement action with Wells Fargo for \$1 billion related to its force-placement of unneeded auto insurance and on February 21, 2020, \$3.0 Billion was paid in penalties to the Department of Justice and state regulators for the opening of fraudulent accounts.[7]  Wells Fargo also entered into a deferred prosecution agreement with the Department of Justice to settle a criminal investigation into its conduct. *See* Exhibit 2.

22.     And now, Wells Fargo has caused certain customers to lose their homes and suffer financial, physical, and emotional hardships. In August 2018, Wells Fargo admitted that a "software error" had caused it to deny mortgage modifications to 625 borrowers who actually qualified for and

---

[2] Wells Fargo & Company, *Form 10-Q for Quarter Ending Sept. 30, 2018, SECURITIES & EXCHANGE COMMISSION (Oct. 24, 2018)*, http://tinyurl.com/ybazt2wlhttp://tinyurl.com/ybazt2w1.
[3] Jackie Wattles et al., *Wells Fargo's 20-month nightmare*, CNN (Apr. 24, 2018), https://tinyurl.com/cnn-20-mo-nightmare.
[4] Gretcchen Morgenson, Wells Fargo Forced Unwanted Auto Insurance on Borrowers, NEW YORK TIMES (July 27, 2017), https://tinyurl.com/y8p5c4sd.
[5] *Id.*
[6] *Id.*
[7] Matthew Goldstein, *Wells Fargo Pays \$1 Billion to Federal Regulators*, NEW YORK TIMES (Apr. 20, 2018), https://inyurl.com/wf-reg-fines.

were entitled to a mortgage modification under federal law.[8] This admission was based on information it knew in 2013 but chose not to disclose for nearly five years.

23.    In November 2018, Wells Fargo announced that it had understated the number of affected borrowers and that it was actually 40% more; now Wells Fargo claims a total of 874 were wrongfully denied loan modifications by the software error.[9] These borrowers should have received a loan modification under the Federal Home Affordable Modification Program (HAMP), but were incorrectly denied.[10]

24.    In the end, more than 545 mortage borrowers lost their homes through foreclosures because of Wells Fargo's software error.[11]

25.    This lawsuit seeks remedies for the harm Wells Fargo caused all borrowers who were erroneously denied a mortgage modification and/or foreclosed upon and who have not been contacted by Wells Fargo and advised of the computer calculation errors because of Wells Fargo's intentional concealment and non-disclosure.

26.    For at least the past fifteen years, one of America's largest financial institutions, Wells Fargo (i.e., Wells Fargo Bank, N.A and Wells Fargo & Company, collectively), has failed to correct serious deficiencies in its infrastructure for managing risks to consumers and complying with the law. As a result, Wells Fargo's customers have been exposed to countless abuses, including racial discrimination, wrongful foreclosure, illegal vehicle repossession, and fraudulently opened accounts.

27.    In response to these issues, the Consumer Financial Protection Bureau ("CFPB"), the Office of the Comptroller of the Currency ("OCC"), and Federal Reserve, took public enforcement actions against Wells Fargo in 2016 and 2018. These actions resulted in the agencies entering into five

---

[8] Ben Lane, *Wells Fargo reveals software error wrongly denied much-needed mortgage modifications, Housing Wire (Aug. 3, 2018), https://tinyurl.com/y8j9ljvg.*
[9] Ben Lane, *Wells Fargo reveals software error led to hundreds of faulty foreclosures, Housing Wire (Nov. 6, 2018), https://tinyurl.com/y94ezdie.*
[10] *Id.*
[11] *Id.*

Page 5 of 79                                                                      CLASS ACTION COMPLAINT

separate consent orders with Wells Fargo: the CFPB's and OCC's September 8, 2016 sales practices consent orders; the Federal Reserve's February 2, 2018 risk management consent order; and the CFPB's and OCC's April 20, 2018 compliance risk management consent orders. Under each of the aforementioned consent orders, Wells Fargo committed to take steps to remediate harmed customers and develop effective internal controls over risks such as employee misconduct. To date, Wells Fargo has yet to fully satisfy any of the aforementioned orders.

28.    In February 2019, Representative Maxine Waters, Chairwoman of the U.S. House of Representatives Committee on Financial Services ("Committee"), initiated an investigation to (1) determine and evaluate the non-public actions taken by Wells Fargo's board, management, and regulators to facilitate improvements at Wells Fargo; and (2) identify policy solutions to ensure consumers are protected from recidivist megabanks like Wells Fargo. The Committee staff report details the results of the Committee staffs investigation. *See* Exhibit 1, p.4.

29.    Wells Fargo Bank, N.A. is a large, nationally chartered, depository bank headquartered in Sioux Falls, South Dakota. The Bank is a subsidiary of Wells Fargo & Company, a publicly traded bank holding company headquartered in San Francisco, California. Wells Fargo & Company does not manage the Bank's day-to-day operations, but the Company exercises control over the Bank's management team and has the authority to hire and fire the Bank's managers, set company policies and establish the Bank's business strategy. Wells Fargo & Company and its subsidiaries are collectively referred to in the report as "Wells Fargo."

30.    In response to Chairwoman Waters' and Chairman Green's letters, Wells Fargo, its board members, and the regulators, collectively produced approximately 330,000 pages of records. In addition to reviewing these records, Committee staff received briefings from the Federal Reserve, OCC, CFPB, SEC, and Wells Fargo. Committee staff conducted interviews with key executives at Wells Fargo and

CLASS ACTION COMPLAINT
kh@khudsonlaw.com

the former Chair of the board's Risk Committee. Additionally, Committee staff interviewed officials at the Federal Reserve, OCC, and CFPB.

31.    Committee staff's review of the records and witness interviews revealed the following:

- financial regulators knew about serious, enterprise-wide deficiencies at Wells Fargo for years without alerting the public;

- Wells Fargo's board of directors failed to ensure that management could completely address the Company's risk management deficiencies;

- Wells Fargo and political appointees at the CFPB had backchannel communications regarding the CFPB's Compliance Risk Management Consent Order;

- Wells Fargo's board of directors allowed management to repeatedly submit materially deficient plans in response to the consent orders;

- Wells Fargo's board of directors and management prioritized financial and other considerations above fixing issues identified by regulators;

- Wells Fargo's board of directors failed to hold senior management accountable for repeatedly not meeting regulator's expectations under the consent orders;

- during the Committee's March 12, 2019 hearing, Wells Fargo's then CEO Sloan gave inaccurate and misleading testimony about the status of Wells Fargo's compliance with the requirements of the 2018 Compliance Risk Management consent orders; and

- the potential for widespread consumer abuse at Wells Fargo remains. *See* Exhibit 1, p. 14.

**B.    The Federal HAMP Program**

32.    In response to rapidly deteriorating financial market conditions in the late summer and early fall of 2008, Congress enacted the Emergency Economic Stabilization Act. The centerpiece of the Act was the Troubled Asset Relief Program (TARP), which required the Secretary of Treasury to "implement a plan" to "minimize foreclosures" and keep troubled mortgage-borrowers in their homes.[12]

33.    In addition to the Emergency Economic Stabilization Act and the TARP, many mortgage lenders, including Wells Fargo, developed internal mortgage modification or other relief programs, which were modeled after and had requirements for eligibility similar to HAMP.

---

[12] *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d. 547, 556 (7th Cir. 2012).

34.     The Treasury Secretary created the HAMP program to carry out Congress's mandate. HAMP received \$50 billion in TARP funds.[13] Mortgage lenders that *chose* to participate in the HAMP program were eligible to receive allocations of these stimulus funds.

35.     Wells Fargo chose to participate in HAMP.

36.     To participate, Wells Fargo was required to comply with all HAMP program requirements. In exchange for up to \$6.4 billion in HAMP funds, Wells Fargo agreed to abide by all "guidelines and procedures issued by the Treasury with respect to [HAMP]" and "any supplemental documentation ... issued by the Treasury," including "Supplemental Directives." *See* Wells Fargo, *Amended and Restated Servicer Participation Agreement, § 1(B).[14]*

37.     In a Supplemental Directive, the Treasury Secretary required loan-Servicers participating in HAMP to issue a mortgage modification to any borrower who met all the criteria to qualify. *See* Supplemental Directive 09-01 (if a borrower meets all qualifying criteria, "the servicer MUST offer the modification") (emphasis in original).

38.     To be eligible for HAMP, borrowers needed to (among other things):

     a.     Show that they had suffered a financial hardship;

     b.     Be able to pay 31% of their monthly income towards the mortgage.

39.     If the borrower met these eligibility criteria, the loan servicer participating in HAMP was required to issue a mortgage modification if the "Net Present Value" of the modified mortgage was positive, meaning it was "more profitable to modify the loan" than to "allow the loan to go into foreclosure."[15]  In simplified terms, the basic formula for calculating Net Present Value is:  Net Present Value = (Expected Revenue from Modified Mortgage) - (Expected Cost of Foreclosing).

---

[13] *Id.*
[14] Available at https://tinyurl.com/wells-fargo-hamp-agreement.
[15] *Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 557 (7th Cir. 2012).

CLASS ACTION COMPLAINT

kh@khudsonlaw.com

40.     A negative Net Present Value meant that the lender was expected to lose money by foreclosing on rather than modifying the mortgage.

41.     If the Net Present Value calculation was positive, the Treasury Secretary required the loan servicer to issue a modification. If it was negative, the servicer could choose to offer a modification, but did not have to. *See* Supplemental Directive 09-01. Loan servicers received HAMP money for every loan modification they issued, as an incentive to offer modifications.

42.     When modifying a mortgage, HAMP-participating lenders were required to reduce the borrower's monthly mortgage payment to get it "as close as possible to 31 percent" of the borrower's monthly income.[16] To achieve this, loan servicers were required to reduce the interest rate on the loan.[17] If this reduction was insufficient to get the payment down to 31 percent of borrower income, the loan servicer was required to convert the mortgage to a 40-year term.[18] If that wasn't enough, the servicer had to place the loan in forbearance and waive interest on the loan while in forbearance.[19]

43.     Borrowers who qualified for HAMP were generally given a "trial" modification for three months or more. If they were able to pay the modified amount and remained HAMP-eligible, they could receive a permanent modification.

**C.      Wells Fargo's Proprietary Software Miscalculates "Net Present Value," Wrongly Denying Mortgage Modifications to Borrowers**

44.     Fannie Mae created a software tool for loan servicers to use for calculating Net Present Value (NPV) for HAMP purposes.[20] Fannie Mae is a financial-services corporation created by Congress.

---

[16] Supplemental Directive 09-01.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *See* Supplemental Directive 09-01, at *4, available at https://tinyurl.com/hamp-supp-dir.

45. As the Treasury Secretary notes, Fannie Mae's NPV calculator was made available to HAMP-participating loan-servicers on the HAMP servicer web portal, "www.financialstability.gov."[21]

46. The Treasury Secretary's Supplemental Directive 09-01 allows loan servicers with $40 billion or more in mortgage loans to use their own proprietary NPV calculator, rather than the default calculator provided on the HAMP web portal.[22]

47. In a July 2018 SEC filing, Wells Fargo revealed that it had discovered a "calculation error" in a software tool it used to determine whether to issue a mortgage loan modification.[23] The tool miscalculated certain fees when "determining whether a customer qualified for a mortgage loan modification pursuant to the requirements" of HAMP.[24] Wells Fargo said that the software error was corrected on October 20, 2015; yet Wells Fargo did not disclose the error for another three years.[25] Wells Fargo determined that the software error had affected "approximately 625 customers," who were "incorrectly denied a loan modification."[26] Wells Fargo said it had set aside $8 million to "remediate" the error without any explanation as to how it calculated this amount.[27]

48. In an October 2018 SEC filing, Wells Fargo expanded the number of consumers harmed by its conduct. It said that although the software error had been fixed on October 20, 2015, Wells Fargo had discovered "related errors" that had continued until April 30, 2018.[28] Wells Fargo said, "Similar to the initial calculation error, these errors caused an overstatement of the attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification."[29] Attorneys' fees are relevant to HAMP's Net Present Value calculation because they are a substantial

---

[21] *Id.* at *4-5.
[22] *Id.* at *5.
[23] Wells Fargo & Company, *10-Q for Period Ending June 30, 2018, SEC* (July 25, 2018), https://tinyurl.com/y9te58qx.
[24] *Id.* at *5.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] Wells Fargo & Co., *10-Q for Period Ending September 30. 2018,* https://tinyurl.com/ybazt2wl.
[29] *Id.* at *6.


kh@khudsonlaw.com

1  cost in the foreclosure process. An overstatement of attorney's fees would exaggerate the loss that the

2  lender expected to take on the loan, reducing the Net Present Value of a modification, and erroneously

3  reducing the number of modifications offered. As a result of the attorneys' fees overstatement, "870

4  customers were incorrectly denied a loan modification," according to Wells Fargo.[30]  Of those, 545

5
6  customers lost their homes to foreclosure.[31]

7        49.    In its latest SEC filing, Wells Fargo said it had "contacted a substantial majority of the

8  approximately 870 affected customers to provide remediation."[32]  Wells Fargo's "remediation" is

9  typically a check of between $1,400 and $25,000. The basis for these amounts is not explained or

10  supported.

11       50.    Plaintiff brings this lawsuit on behalf of himself and other similarly situated borrowers

12  throughout the U.S. who have not been contacted because this amount is insufficient to compensate for

13
14  the loss of their homes and other damages and injuries suffered.

15       51.    Wells Fargo essentially concedes as much when, in its SEC filing, it also stated that it is

16  giving customers "the option also to pursue no-cost mediation with an independent mediator"[33] to

17  negotiate additional compensation.

18       **D.    Wells Fargo's Miscalculation Errors and Resulting Foreclosures Caused Class
19       Members Substantial Financial and Other Harm**

20       52.    In the wake of the 2008 financial crisis, homeowners were struggling to make ends meet.

21       53.    Plaintiff and Class Members applied for loan modifications and many were told that they

22  did not qualify for a loan modification. Plaintiff and Class Members had little choice but to take Wells

23  Fargo at its word that they did not qualify for HAMP, they relied on and trusted Wells Fargo to perform

24  the Net Present Value calculation correctly.

25

26

27  [30]  *Id.*
     [31]  *Id.*
28  [32]  *Id.*
     [33]  *Id.*

CLASS ACTION COMPLAINT
                                                                          kh@khudsonlaw.com

54.     Starting in the fall of 2018 Wells Fargo sent <u>some</u> borrowers a form letter. The letter said:

> When you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation, and we're sorry. If it had been correct, you would have been approved for a trial modification.

55.     Included with the letter, Wells Fargo sent <u>some</u> borrowers a check ranging from $1,400 to $25,000. Wells Fargo did not explain the basis for the amount offered to customers and why some were offered more than others. Nor has Wells Fargo told borrowers what the "faulty calculation" was or why it occurred or explained how it was discovered.

56.     Wells Fargo has not sent Plaintiff (or Class Members) a letter or check or otherwise notified or contacted him regarding the computer error and wrongful denial of his mortgage modification even though Wells Fargo overstated the foreclosure attorney or other fees and attempted to refund the inappropriate fees charged during a review of the account on October 26, 2016 after the modification had been denied. Wells Fargo did not correctly perform the Net Present Value Calculation correctly because Plaintiff alleges it estimated and included and overstated legal fees pertaining to redemption of the property from the tax buyer at the condo association's foreclosure sale. Plaintiff also alleges Wells Fargo erroneously included the $17,200 estimated redemption costs amount in its net present value calculation, which would have overstated the expected cost of foreclosing.

57.     Wells Fargo did not notify or contact Plaintiff about the computer error even when Plaintiff filed an administrative appeal of his modification denial alleging Wells Fargo's conflict of interest and other inappropriate conduct. Wells Fargo did not approve Plaintiff's and other Class Members modification requests because it would have lost substantial revenue and would not retain and continue to collect various late fees, legal fees and other fees from borrowers, per its servicing agreement.

58.    Wells Fargo did not respond to Plaintiff's allegations set forth in its administrative appeal request or explain why the modification was denied; nor did Wells Fargo disclose to Plaintiff the software miscalculation of legal fee errors, which it knew about as early as October 2015 but instead filed its foreclosure petition about the same time period and continued to conspire to conceal the computer error and other related errors until 2018.  Wells Fargo may have known about the errors and miscalculations as early as 2013.

59.    During 2013, 2014 and 2015, Plaintiff had numerous recorded telephone conversations with his assigned home preservation specialist, Susan Hartman, an employee of Wells Fargo, who failed to disclose the computer calculation error regarding legal fees and other related errors and continued to conspire to conceal and cover up the errors regarding Plaintiff's modification request and wrongful denial thereof by Wells Fargo.

60.    On June 29, 2015, Wells Fargo and its employee continued to conceal and conspire to cover up its wrongful, fraudulent and grossly negligent errors by switching Plaintiff's home preservation specialist contact to, Samantha Brokenshire, in an attempt to "short circuit" all the questions Plaintiff was asking pertaining to his mortgage modification request and inappropriate conduct on the part of Wells Fargo, including an apparent conflict of interest.  Wells Fargo never denied or responded to Plaintiff's conflict of interest allegation in his appeal regarding its modification denial, nor disclosed the computer error to Plaintiff regarding the overstatement of legal fees and other related costs and errors. Wells Fargo never explained its net present value calculation or specifically delineated why the modification was denied.

61.    As Wells Fargo admits in its letters, customers suffered serious financial harm as a result of foreclosures that should never have happened.  In the letters, Wells Fargo says, we've carefully considered what we can do for you.  You'll find a payment enclosed to help make up for your financial

loss (emphasis added.)  Wells Fargo also admits in the letter that customers suffered negative reporting on their credit reports.

62.     Although Wells Fargo does not acknowledge it, Class Members suffered other substantial harm as well.

63.     Plaintiff, in 2005, was working full-time as an attorney in Chicago, Illinois and bought a retirement condo in Hillsboro Beach, Florida for $495,000, with a down payment of $50,000 and a first mortgage from Wells Fargo of $445,000.

64.     Wells Fargo transferred the note and mortgage to U.S. Bank National Association, as Trustee, for J.P. Morgan Mortgage Acquisition Trust 2006-WF1.

65.     Wells Fargo continued to service Plaintiff's mortgage as servicer under a servicing agreement.

66.     In 2008, the real estate market in Florida started to experience a substantial decline in home values and Plaintiff's retirement condo declined in fair market value by more than 50% but regained some of its value by 2014, the time of the modification request.

67.     In December 2011, for medical and other financial hardship reasons, Plaintiff was forced to retire from the law firm where he had worked for almost 20 years and moved to Florida.

68.     On Sept. 4, 2014, Plaintiff requested a mortgage modification under HAMP, HARP and the National Mortgage Settlement Agreement and submitted substantial documentation that he met the requirements of the various modification programs.  Two drive by appraisals were performed, one for $370,000 as of August 14, 2014 and the other for $395,000 as of October 22, 2014.  Additionally, Plaintiff's neighbor made a written offer to buy the condo for $405,000 in 2015.

69.     Initially, his modification request was denied allegedly because requested documentation had not been submitted.  Later, the modification request was denied by Wells Fargo with no specifics, other than to say Plaintiff did not meet the requirements.

70.    On January 17, 2015, Plaintiff filed an administrative appeal of his modification denial stating that Wells Fargo had a conflict of interest with regard to the modification because it will lose substantial servicing fee revenue and reimbursement for late fees if it allows, recommends, or grants a mortgage modification.  Pursuant to its loan servicing agreement, if a modification were granted, Wells Fargo would lose future revenue and revenue it collected from late fees and attorney fees that it would otherwise retain.  Additionally, Wells Fargo also had a conflict of interest because it had an implied fiduciary relationship with Plaintiff for purposes of the modification request and also acted as a dual fiduciary under the mortgage servicing agreement for the owners of the mortgage and the investors. Wells Fargo acted in a dual capacity as Master Servicer and Securities Administrator under the mortgage servicing and pooling agreement.

71.    On January 27, 2015, Wells Fargo rendered a decision on Plaintiff's administrative appeal simply stating, "you still do not meet the requirements for a loan modification" but gave no specific reasons for the disqualification under HAMP.  Nor did Wells Fargo disclose the computer net present value miscalculation errors of legal fees and other costs.

72.    Wells Fargo also denied relief to the Plaintiff under the Home Affordable Refinance Program (HARP) and other modification programs, such as the National Mortgage Settlement Agreement of 2012.  Plaintiff alleges that the same computer miscalculation errors were employed in these modification denials as well.

73.    In late 2014 or early 2015, Wells Fargo started the foreclosure process but did not file its foreclosure complaint until October 27, 2015.  The Florida retirement condo sold for $288,000 at the first mortgage foreclosure sale on May 9, 2017 but not before it was foreclosed on by the condo association for non-payment of condo assessments.  Wells Fargo lost approximately $125,200 by foreclosing.  It could have made a profit of about $254,688 by modifying Plaintiff's mortgage to a

40 year term and reducing the interest rate to 3.6% from 6.625% and reducing the monthly payment to $1,818 from $2,830. Plaintiff's monthly payment would have been reduced by $1,000.

74.    Wells Fargo was notified and knew of the unpaid condo assessments before it started the foreclosure process but failed to timely pay the unpaid assessments and charge the payment to Plaintiff's mortgage account just like it did with unpaid real property taxes and unpaid property insurance and coverage.

75.    Wells Fargo also failed to timely redeem the property for $17,200 as required by the terms of the servicing agreement and mortgage when it was sold for non-payment of condo assessments on May 27, 2015. Wells Fargo had a Fiduciary duty to redeem the property under both the servicing agreement and the mortgage but failed to do so.

76.    Plaintiff's mortgage was in the pre-foreclosure or foreclosure process at various stages between April 12, 2010 and 2018 but Plaintiff was not notified or contacted by Wells Fargo and not sent a check for any injuries it may have incurred for the wrongful modification denial and wrongful foreclosure caused by the computer calculation errors with regard to the overstatement of legal fees and other costs.

77.    On October 27, 2015, Wells Fargo filed and verified the wrongful judicial foreclosure complaint on Plaintiff's Florida retirement condo as "Attorney In Fact" for the trustee U.S. Bank National Association and investor J.P. Morgan J.P. Morgan Acquisition Trust 2006-WF1. Plaintiff contested the foreclosure case and modification denial but a judgement of foreclosure was entered on March 21, 2017, in Broward County, Florida's Seventeenth Judicial Circuit Court, Civil Division, Case #2015-CA-019042. The judgment of foreclosure was issued the same day as a hearing on Wells Fargo's motion for summary judgement, which was granted. Plaintiff had contested the summary judgment motion with his filing of a memorandum of law and affidavit but the property was sold on May 9, 2017 for $288,000.

78.    Plaintiff filed an appeal of the judgment of foreclosure in the District Court of Appeal, Fourth District, State of Florida, Case No. 4D17-1177.

79.    The appellate court affirmed the judgment of foreclosure but stated that Mr. Hudson's RICO claim against Wells Fargo for inspection fees charged but not performed as mortgage servicer, would be a set off, if the foreclosure judgment was pursued against him personally because he was not the current owner of the property having lost title on June 9, 2015, approximately 4 months before the foreclosure complaint was filed by Wells Fargo on October 27, 2015. A buyer at the condo association foreclosure sale bought the property on June 9, 2015 for $17,200 dollars. Plaintiff lost title after 10 years of ownership and mortgage payments because Wells Fargo did not redeem the property as required under its servicing agreement and Plaintiff's mortgage and notes.

80.    Plaintiff filed an appeal before the Florida Supreme Court but the case was dismissed because the court said the appeal was not timely.

**E.    Prior Litigation Involving Plaintiff And His Mortgage With Wells Fargo**

81.    Wells Fargo was sued by the United States of America, the State of Florida and other states for racial discrimination against Plaintiff and other African American and other minority borrowers in its mortgage lending during 2004 to 2009 and paid 175 Billion dollars to settle in July 2012 but Plaintiff was never contacted or notified by Wells Fargo or paid any settlement amounts by Wells Fargo or the State of Florida (the State of Florida received the largest allocation amount from the global settlement).

82.    In 2012, the United States of America and many states again sued Wells Fargo and other banks for various servicer misconduct during the foreclosure crisis. There was a 25 Billion dollar settlement. Plaintiff was a Class Member but again Plaintiff was not contacted and received no settlement amounts from the State of Florida, even though the State of Florida received the largest allocation amount of the global settlement. Wells Fargo was paid $1.01 billion dollars by the Federal

and State governments under HAMP and HARP to provide mortgage and foreclosure relief and promised $4.34 billion dollars in relief to affected borrowers. On September 8, 2014, Plaintiff applied for financial relief from Wells Fargo but was denied. See National Mortgage Settlement Consent Judgment, United States District Court, District of Columbia, Civil Action No. 12-0361.

83.    On October 2, 2013, the New York Attorney General filed a motion to enforce the National Mortgage Settlement and force Wells Fargo to honor its agreement to provide 4.34 billion dollars in mortgage modification and other relief to Class Members (including Plaintiff) but Wells Fargo continued to deny a mortgage modification or other relief to Plaintiff.

84.    In the United States District Court, Southern District of Iowa, Case Number 4-08-CV-507, a case initially filed in California, Plaintiff and other Class Members claimed under RICO that Wells Fargo improperly, illegally, and routinely charged Plaintiff and other borrowers via its MSP computer software for the cost of property inspections it never performed whenever a borrower was 45 days or more late in making a mortgage payment and then ordered subsequent inspections every 25-35 days for as long as the borrower remained delinquent. Plaintiff was fraudulently charged fees on its Wells Fargo mortgage statements for the years 2005 through 2016, and the amounts were material.

85.    On February 17, 2016, Plaintiff opted out of the above RICO settlement agreement and raised its claim as a defense to his foreclosure case filed by Wells Fargo. The Florida Appellate Court ruled that Plaintiff's RICO claim was a valid affirmative defense and set off in the foreclosure action, if Wells Fargo pursued Plaintiff personally for payment of the foreclosure judgment. If Plaintiff and the circuit and appellate courts had known of Wells Fargo's concealment fraud with regard to the MSP computer calculation errors and overstating of legal fees in the modification eligibility determination, Plaintiff would have pursued sanctions on Wells Fargo for non-disclosure of the errors and summary judgment would not have been granted in Plaintiff's foreclosure case.

## VI.    CLASS ALLEGATIONS

86.    This putative class action is brought pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of the following Nationwide Class:

> All persons who had any HAMP or other mortgage modification request denied by Wells Fargo between 2010 and 2018 and who filed an administrative appeal of the denial and were not notified or advised by Wells Fargo of the MSP computer calculation errors pertaining to the overstatement of foreclosure legal fees or related errors, in determining eligibility for a loan modification and Wells Fargo did not disclose the computer calculation errors as required.

In addition, Plaintiff asserts claims on behalf of the following Florida Subclass:

> All persons who had any HAMP or other mortgage modification request denied and were foreclosed upon by Wells Fargo as "Attorney In Fact" for property located in Florida between 2010 and 2018 and contested the modification denial during the judicial foreclosure proceedings but were not notified or advised by Wells Fargo during the proceedings of the MSP computer calculation errors pertaining to the overstatement of foreclosure legal fees or related errors, in determining eligibility for a loan modification, and Wells Fargo did not disclose the computer calculation errors as required.

87.    Excluded from the Class are:  Wells Fargo Bank, N.A. and any of its parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Wells Fargo has a controlling interest.  Also excluded are any individuals who make a timely election to opt out of this proceeding using the proper protocol.  Also excluded are:  any federal, state or local governments, including any governmental departments, agencies, divisions, bureaus, boards, sections, groups, counsels, or subdivisions.  Lastly, excluded from the Class are:  any judges assigned to hear any aspect of this litigation, as well as their immediate family Members.

88.     Plaintiff reserves the right to modify or amend this Class definition before the Court determines whether certification is appropriate.

89.     Numerosity. The Class is so numerous that joinder of all Members is impractible. Wells Fargo completed 1.6 million modification requests through HAMP and denied 72% or 1,152,000. The exact number of affected individuals is not known.

90.     Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.      Whether Wells Fargo's software program or calculation protocols were negligently designed and/or used;

b.      Whether Wells Fargo's conduct violated Federal HAMP rules and was a pattern of racketeering activity under 18 U.S.C. § 1961, 1962 and 1964.

c.      What caused the miscalculation error(s) and why did Wells Fargo knowingly conceal the errors from plaintiffs for many years;

d.      What process Wells Fargo used to determine which borrowers were affected or unaffected by the miscalculation error(s);

e.      What process Wells Fargo used to determine how much money to send each borrower as part of its voluntary remediation program;

f.      What process Wells Fargo used to notify borrowers of the availability of a check and other relief, given that the foreclosed property address is unlikely to be the current address;

g.      Whether Defendant's conduct was an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200, et seq.;

h.      Whether Defendant's conduct emanated from California, such that California law should be applied for all Class Members;

i.      Whether Plaintiff and the Class are entitled to equitable relief, including, but not limited to, injunctive relief and restitution;

j.      Whether Plaintiff and the other Class Members are entitled to actual, statutory, or punitive damages, and other monetary relief.

91.    Typicality. Plaintiff's claims are typical of those of other Class Members because each seeks to recover for injuries caused by the same calculation error and each was denied a HAMP or other mortgage modification by Wells Fargo.

92.    Adequacy. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's soon to be retained counsel will be competent and experienced in litigating class actions.

93.    Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the Members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

94.    Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied.

95.    Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2), because Defendant has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## VII.   CHOICE OF LAW ALLEGATIONS

96.    The State of California has sufficient contacts to the conduct alleged herein that California law may be uniformly applied to the claims of the proposed Class.

CLASS ACTION COMPLAINT
kh@khudsonlaw.com

97.     Wells Fargo does substantial business in California; its headquarters is located in California; and a significant portion of the proposed Nationwide Class is believed to be located in California and there are other similar class actions pending in California involving the computer calculation error and overstatement of legal fees that may be relevant or related to this class action suit. See U.S. District Court, California Northern District (San Francisco), Case No.: 3:18-CV-07354-WHA.

98.     In addition, the conduct that forms the basis for each and every Class Member's claims against Wells Fargo emanated from Wells Fargo's U.S. headquarters in San Francisco, California, where—among other things—Wells Fargo received customer complaints, planned and concealed its communications with Class Members, and set its national HAMP compliance and software auditing policies with regard to its mortgage servicing business. Wells Fargo has serviced hundreds of mortgages for properties located in California.

99.     The State of California also has the greatest interest in applying its law to Class Members' claims. Its governmental interests include not only an interest in compensating resident consumers under its consumer protection laws, but also what the State has characterized as a "compelling" interest in using its laws to regulate a resident corporation and preserve a business climate free of fraud and deceptive practices. *Diamond Multimedia Sys. v. Sup. Ct.,* 19 Cal. 4th 1036, 1064 (1999).

100.     If other states' laws were applied to Class Members' claims, California's interest in discouraging resident corporations from engaging in the sort of unfair and deceptive practices alleged in this complaint would be significantly impaired. California could not effectively regulate a company like Wells Fargo, which does business throughout the United States, if it could not ensure that consumers are compensated for conduct that runs afoul of its laws.

1

## VIII.  TOLLING ALLEGATIONS

2

101.    Plaintiff and Class Members could not have discovered, through reasonable diligence,

3

that Wells Fargo's software contained calculation errors that denied HAMP loan modifications to

4

borrowers who were entitled to receive a modification under the HAMP program.

5

102.    The evidence and means of discovering the calculation errors, and the systematic nature

6

of the problem, were within Wells Fargo's exclusive control.

7

8

103.    As a result, any applicable statutes of limitation are tolled.

9

104.    In addition, any applicable statutes of limitations have been tolled by Wells Fargo's

10

knowing, active, intentional, and fraudulent concealment of the facts alleged herein.  Wells Fargo kept

11

Plaintiff and all Class Members ignorant of vital information essential to the pursuit of their claims,

12

without any fault or lack of diligence on the part of Plaintiff.  Razor Capital LLC v. CMAX Finance

13

LLC, No. 17-80388, 2017 WL 3481761 (S.D. Fla. Aug. 14, 2017).

14

15

105.    Wells Fargo admits in an SEC filing that it knew about the software errors as early as

16

October 2015 but it may have known as early as 2013.  Yet it continued foreclosure proceedings against

17

Plaintiff and Class Members and did not disclose the errors until late 2018.  Plaintiff learned of the error

18

in 2019.

19

106.    Wells Fargo was also under a continuous duty to disclose this information to Plaintiff and

20

Class Members and to the courts whenever Wells Fargo pursued judicial foreclosures as "Attorney in

21

Fact" for the owners of the mortgage and note or for investors.

22

23

107.    Plaintiff and Class Members reasonably relied on Wells Fargo's active and fraudulent

24

concealment of the facts as alleged herein.

25

108.    As a result, Wells Fargo is precluded by equitable estoppel, equitable tolling and

26

fraudulent concealment, from relying on a statute of limitations defense.

27

28

CLASS ACTION COMPLAINT
kh@khudsonlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIRST CAUSE OF ACTION
### Negligent and Gross Negligence Breach of Contract

(Brought On Behalf of Plaintiff and Nationwide Class)

109.    Plaintiff incorporates all allegations as if fully set forth herein.

110.    Under the loan servicing agreement, mortgage and Wells Fargo's HAMP agreement, Wells Fargo owed a duty to Plaintiff and Class Members to implement HAMP's requirements for offering mortgage modifications. Under California law, Plaintiff and Class Members were the intended third party beneficiaries of these agreements and the incentive payments made by the U.S. government to participating HAMP program loan servicers.

111.    Wells Fargo, as loan servicer, also had a contractual duty to exercise reasonable care in the creation, implementation and use of its internal software to determine whether a mortgage modification was required under HAMP guidelines because its involvement in the loan via HAMP exceeds its conventional role. Biakanja v. Irving, 49 Cal. 2d 647 (1958), Rossetta v. Citi Mortgage, Inc., 18 Cal. App 5th 628 (2017). Wells Fargo's mortgage servicing business is a physically separate and distinct corporate business from its mortgage origination and lending business. Its Mortgage Servicing Platform (MSP) computer servers are located in Jacksonville, Florida. Its home mortgage division and loan originations are located in Des Moines, Iowa. Wells Fargo provides mortgage-servicing services to thousands, if not millions, of residential and commercial mortgages where Wells Fargo is not the lender. Wells Fargo processed Plaintiff's modification request as a mortgage servicer, not as a lender.

112.    Wells Fargo had a contractual duty to ensure that borrowers who met all objective requirements were given a HAMP mortgage modification and a duty under Cal. Civ. Code § 2923.6 to maximize net present value, as loan servicer, and act for the benefit of all parties to the loan pool or investors. Plaintiff's 30 year mortgage and note is included in the loan pool.

113.    Wells Fargo failed to exercise reasonable care in the creation, implementation, and use of its internal software to determine whether a mortgage modification was required under HAMP guidelines.

114.    Wells Fargo failed to ensure that borrowers who met all objective requirements were given or offered a HAMP trial mortgage modification.

115.    Wells Fargo denied or failed to offer mortgage modifications to Plaintiff and Class Members who met all objective requirements to receive a permanent HAMP mortgage modification.

116.    Wells Fargo breached its duties to Plaintiff and Class Members by:

a.    Failing to perform mortgage servicing functions pursuant to the servicing agreement and mortgage and consistent with its responsibilities to Plaintiff and Class Members;

b.    Creating, implementing, and using an internal software program and protocols that were flawed and defective and incorrectly calculated whether a borrower was entitled to a HAMP mortgage modification;

c.    Failing to properly supervise its agents, vendors, including Black Knight and including its loss mitigation and collection personnel; foreclosure attorneys; and technical, computer and engineering employees who developed, implemented, and used the internal software to determine whether a borrower qualified for a HAMP mortgage modification;

d.    Making inaccurate calculations and determinations of Plaintiff's and Class Members' eligibility for a HAMP mortgage modification;

e.    Not conducting sufficient testing to determine whether its internal software program was correctly calculating whether a borrower was entitled to a HAMP mortgage modification;

f.    Failing to give HAMP mortgage modifications and HARP relief and National Mortgage Settlement Agreement of 2012 modifications and other foreclosure alternatives to qualified borrowers; and

g.    Conspiring to conceal and concealing the error in its internal software program from approximately 2013 through October 2018.

117.    Wells Fargo knowingly and willfully concealed the computer software errors from Plaintiff and Class Members.

118.    Wells Fargo actually knew during 2013 through 2018 that borrowers such as Plaintiff and Class Members would suffer injury as a result of Wells Fargo's failure to exercise reasonable care and its extreme departure from reasonable care by conspiring to conceal and concealing the computer calculation error from Plaintiff, Class Members and the Office of the Comptroller of the Currency ("OCC") with regard to the overstatement of legal fees and other foreclosure costs such as late fees.

119.    Wells Fargo's violations of law and contractual negligence and gross negligence were the direct and proximate cause of Plaintiff and Class Members' injuries, harm and economic loss, which Plaintiff and Class Members suffered and will continue to suffer.

120.    As a consequence of Wells Fargo's contractual gross negligence, Plaintiff and Class Members were injured in at least the following ways:

a.    wrongful denial of mortgage modifications and wrongful foreclosures;

b.    otherwise avoidable losses of homes with substantial fair market values to foreclosures;

c.    less favorable mortgage modifications;

d.    increased fees and other costs to avoid or attempt to avoid foreclosure, including loans from Plaintiff's relatives that have not been repaid;

e.    lost equity in homes that were foreclosed on and the financial loss on average of 10 years of previously made mortgage payments by Plaintiff and Class Members;

f.    loss of savings in fruitless attempts to secure mortgage modifications;

g.    loss of opportunities to pursue other refinancing or loss mitigation strategies;

1          h.      increased costs associated with lowered credit scores; and

2          i.      significant stress causing physical injuries and emotional distress, especially to

3   Class Members who were disabled, retired, or senior citizens.

4          121.    Plaintiff and Class Members seek recovery of their legal fees because of Wells Fargo's

5   
6   gross negligence and extreme departure from reasonable care.

7          122.    As a direct and proximate result of Wells Fargo's concealment and gross negligence,

8   Plaintiff and Class Members suffered injury, damage, loss, or harm, and seek punitive damages.

9                            **SECOND CAUSE OF ACTION**
                    **Violation Of California's Unfair Competition Law ("UCL")**
10
                    (Brought On Behalf of Plaintiff and Nationwide Class)
11

12         123.    Plaintiff incorporates all allegations as if fully set forth herein.

13         124.    California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq., prohibits

14  "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice," or

15  making deliberate misrepresentations.

16         125.    A business act or practice is "unfair" when it "offends an established public policy or

17  when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to

18  consumers." *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1169 (9th Cir. 2012).
19

20         126.    Wells Fargo engaged in business acts and practices that are immoral, unethical,

21  oppressive, unscrupulous, and substantially injurious to consumers by, among other things:

22         a.      Failing to perform mortgage servicing functions consistent with its contractual or

23  other responsibilities to Plaintiff and Class Members;

24         b.      Creating, implementing, and using an internal software program and protocols
25
    that were flawed and defective and incorrectly calculated whether a borrower was entitled to a HAMP or
26
    other mortgage modification;
27

28

                                                                                        kh@khudsonlaw.com

c.      Wells Fargo and the Board failed to properly supervise its subsidiaries, agents and employees, including Black Knight and including its loss mitigation and collection personnel; foreclosure attorneys; and technical, computer, and engineering employees who developed, implemented, and used the internal software to determine whether a borrower qualified for a HAMP or other mortgage modification, *See* Exhibit 1, pp 31-62;

d.      Making inaccurate calculations and determinations of Plaintiff's and Class Members' eligibility for a HAMP mortgage modification;

e.      Not conducting sufficient testing to determine whether its internal software program was correctly calculating whether a borrower was entitled to a HAMP or other mortgage modification;

f.      Failing to give HAMP mortgage modifications and other foreclosure alternatives to qualified borrowers; and

g.      Knowingly and intentionally concealing the error in its internal software program from approximately 2013 through October 2018 and misusing the attorney-client privilege to conceal and not disclose the matter to the OCC, Plaintiff and Class Members and the public. *See* Exhibit 1, p. 43.

127.    The harms from these business acts and practices outweigh any potential utility.

128.    Wells Fargo's business acts and practices offend established public policies that are tethered to specific constitutional, statutory, and/or regulatory provisions, such as HAMP.  The Department of the Treasury states that HAMP was designed to help families who are struggling to remain in their homes.

129.    A business act or practice is "unlawful" when it is proscribed by some other statute, regulation, or constitutional provision.  "By prescribing 'any unlawful' business practice, the UCL permits injured consumers to 'borrow' violations of other laws and treat them as unlawful competition

that is independently actionable." In re Adobe Sys., Inc. Privacy Litig., 66 F. Supp. 3d 1197, 1225 (N.D. Cal. 2014).

130.    Wells Fargo engaged in business acts or practices that were proscribed by law, including the following: Wells Fargo engaged in unfair business practices under § 5 of the Federal Trade Commission (FTC) Act; Wells Fargo violated the requirements of HAMP, such as Supplemental Directive 09-01 (if a borrower meets all qualifying criteria, "the servicer MUST offer the modification") (emphasis in original); and Wells Fargo, as servicer, violated Cal. CIV. Code § 2923.6 and its duty owed to all parties in a loan pool, including Plaintiffs and Class Members, to maximize net present value and to offer the borrower a loan modification or workout plan if such modification or plan is consistent with its "contractual or other authority." Cal. Civ. Code § 2923.6 requires Wells Fargo to offer the borrower a modification or workout plan because such is consistent with its servicing agreement and HAMP.

131.    Uniformly telling borrowers that they were not qualified or eligible for a HAMP mortgage modification when they in fact were qualified constitutes a fraudulent practice under the UCL because it was likely to deceive Plaintiff and Class Members about their entitlement to a mortgage modification under HAMP, Cal. Civ. Code § 2923.6 and conceal the adequacy of Wells Fargo's methods for evaluating someone's entitlement to a modification.

132.    Wells Fargo knew or had reason to know that Plaintiff and Class Members were entitled to a mortgage modification under HAMP and Wells Fargo acted with reckless disregard for the truth. Wells Fargo had superior knowledge and exclusive control of the facts, figures, and tools to determine Plaintiff and Class Members' entitlement to modifications under HAMP and Plaintiff and Class Members could not have reasonably discovered the truth without tremendous difficulty.

133.    Plaintiff was notified by U.S. mail of Wells Fargo's misrepresentations concerning his entitlement to a modification and reasonably relied on those misrepresentations.

134.    As a direct and proximate result of Wells Fargo's unfair, unlawful, and fraudulent business acts and practices, Plaintiff and Class Members suffered injury in fact and lost money or property, including through:

      a.    wrongful judicial foreclosures and misconduct in pursuing them;

      b.    otherwise avoidable losses of homes to foreclosure;

      c.    denial of modifications and less favorable mortgage modifications;

      d.    increased fees and other costs to avoid or attempt to avoid foreclosure, including loans from relatives that have not been repaid;

      e.    lost equity in homes that were foreclosed on and the loss on average of 10 years of previously made mortgage payments by Plaintiff and Class Members;

      f.    loss of savings in fruitless attempts to secure mortgage modifications;

      g.    loss of opportunities to pursue other refinancing or loss mitigation strategies; and

      h.    increased costs associated with lowered credit scores.

135.    Plaintiff and Class Members are entitled to relief, including attorneys' fees and costs, restitution, declaratory relief, and a permanent injunction enjoining Wells Fargo from its unlawful, fraudulent, and unfair practices. Plaintiff also seeks punitive damages in addition to reasonable attorneys' fees and costs under applicable law, including Federal Rule of Civil Procedure 23 and California Code of Civil Procedure § 1021.5.

### THIRD CAUSE OF ACTION
### Violation Of Florida's Deceptive And Unfair Trade Practices Act

(Brought On Behalf of Plaintiff and Florida Subclass)

136.    Plaintiff incorporates all allegations as if fully set forth herein.

137.    Florida Deceptive and Unfair Trade Practices Act, ("FDUTPA"), sections 501.201-213.

138.     The Florida Deceptive and Unfair Trade Practices Act, (FDUTPA), sections 501.201-213, Florida statutes, prohibits unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce, § 501.202(2).

139.     An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. "*Samuels v. King Motor Co. of Boca Raton,* 782 So.2d at 499 (quoting *Spiegel, Inc. v. Fed. Trade Comm'n,* 540 F.2d 287, 293 (7th Cir. 1976)); see *Millennium Communications & fulfillment, Inc. v. Office of the Attorney Gen.,* 761 So.2d 1256, 1263 (Fla. 3d DCA 2000) (stating that deception occurs if there is a "'representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'") (Quoting *Southwest Sunsites, Inc. v. Fed. Trade Comm'n*, 785 F.2d 1431, 1435 (9th Cir. 1986)).

140.     FDUTPA allows private causes of action for both declaratory and injunctive relief and for recovery of actual damages, including Plaintiff's attorneys' fees.

141.     The Florida Supreme Court has held that FDUTA applies to private causes of action arising from single unfair or deceptive acts in the conduct of any trade or commerce, even if it involves only a single party, a single transaction, or a single contract. *Samuels*, 782 So.2d at 499. More recently, Florida federal district courts have held that violations of criminal statutes may serve as a statutory predicate for a per se FDUTPA violation. A violation of Florida's unauthorized practice of law statute may serve as a statutory predicate for a per se FDUTPA violation. *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.,* 103 F.Supp.3d 1343, 1354 (S.D. Fla. 2015) ("The Court finds that there is no genuine issue of material fact as to whether Defendants violated the FDUTPA. Defendants engaged in unfair and deceptive acts and practices in the conduct of their trade and commerce by unlawfully operating medical clinics, in violation of Florida law".)

CLASS ACTION COMPLAINT
kh@khudsonlaw.com

142.    When the product is rendered valueless as a result of the defect or as in the present case modification denial and foreclosure against the property, then the purchase price may be the appropriate measure of actual damages. *Rollins, Inc. v. Heller*, 454 So.2d 580, 585 (Fla. 3d DCA 1984).

143.    Wells Fargo's unconscionable, unfair and deceptive practices include:

a.    Failing to perform mortgage servicing functions consistent with its responsibilities to Plaintiff and Class Members under the servicing agreement and mortgage;

b.    Creating, implementing, and using an internal software program and protocols that were flawed and defective and incorrectly calculated whether a borrower was entitled to a HAMP mortgage modification and knowingly and intentionally concealing the error in its internal software program calculation of legal fees from 2013 through 2018;

c.    Wells Fargo and its Board failed to properly supervise its agents, subsidiaries, vendors and employees, including Black Knight and including its loss mitigation and collection personnel; foreclosure attorneys; and technical, computer, and engineering employees who developed, implemented, and used the internal software to determine whether a borrower qualified for a HAMP mortgage modification;

d.    Making inaccurate calculations and determinations of Plaintiffs and Class Members' eligibility for a HAMP mortgage modification and knowingly concealing the inaccurate calculations from 2013 through 2018;

e.    Not conducting sufficient testing to determine whether its internal software program was correctly calculating whether a borrower was entitled to a HAMP or other mortgage modification, *See* Exhibit 1, pp. 31-62;

f.    Failing to give HAMP mortgage modifications and other foreclosure alternatives to qualified borrowers; and

CLASS ACTION COMPLAINT

kh@khudsonlaw.com

g.    Conspiring to conceal and knowingly concealing the error in its internal software program from approximately 2013 through October 2018 and misusing the attorney-client privilege to conceal and not disclose the matter to the OCC, Plaintiff and Class Members and the public. *See* Exhibit 1, p. 43.

144.   Wells Fargo's misrepresentations and omissions were material because they were likely to deceive Plaintiff and Class Members about their entitlement to a mortgage modification under HAMP and the adequacy of Wells Fargo's methods for evaluating someone's entitlement to a HAMP, HARP or other modification.

145.   Wells Fargo intended to mislead Plaintiff and Class Members and induce them to rely on its misrepresentations and omissions.

146.   Wells Fargo acted intentionally or knowingly to violate Florida's Deceptive and unfair Trade Practices Act, and recklessly disregarded Plaintiff and Class Members' rights by fraudulently concealing and conspiring to conceal its material errors with regard to mortgage modification.

147.   As a direct and proximate result of Wells Fargo's unconscionable and deceptive practices, Plaintiff and Class Members suffered injury in fact and lost money or property, including through:

a.    wrongful judicial foreclosures and criminal misconduct in pursuing them (see Fourth Cause of Acton);

b.    otherwise avoidable loss of homes to foreclosure with substantial fair market values;

c.    denial of modifications and less favorable mortgage modifications;

d.    increased fees and other costs to avoid or attempt to avoid foreclosure, including loans from relatives that have not been repaid;

e.    lost equity in homes that were foreclosed on and the loss on average of 10 years of previously made mortgage payments;

CLASS ACTION COMPLAINT
kh@khudsonlaw.com

f.     loss of savings in fruitless attempts to secure mortgage modifications;

g.     loss of opportunities to pursue other refinancing or loss mitigation strategies; and

h.     increased costs associated with lowered credit scores.

148.    Because of Wells Fargo's unconscionable and deceptive business practices, Plaintiff and Class Members are entitled to relief, including injunctive relief, other equitable relief, actual damages, restitution, and attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### Violation Of Florida's Unauthorized Practice Of Law Statute

(Brought On Behalf of Plaintiff and Florida Subclass)

149.    Plaintiff incorporates all allegations as if fully set forth herein.

150.    All of the wrongfully denied modifications and wrongful foreclosures pursued by Wells Fargo against Plaintiff and other Class Members by Wells Fargo for property located in the State of Florida violated the statutory prohibition against the unlicensed practice of law, which is a criminal felony of the third degree violation of Florida law.

151.    "Any person not licensed or otherwise authorized to practice law in this state who practices law in this state or holds himself or herself out to the public as qualified to practice law in this state, or who willfully pretends to be, or willfully takes or uses any name, title, addition, or description implying that he or she is qualified, or recognized by law as qualified, to practice law in this state, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or 775.084." Fla. Stat. Section 454.23 (2012).  The statute has been held not to be unconstitutionally vague.  State v. Foster, 674 So.2d 747 (Fla. 1st DCA 1996); State v. Trotter, 677 So.2d 35 (Fla. 5th DCA 1996).

152.    All of the wrongful judicial foreclosure complaints filed in the State of Florida by Wells Fargo were signed and verified by Wells Fargo as "Attorney In Fact" for the mortgage owners, lenders, or investors.

153.    Signing a judicial or court foreclosure complaint on behalf of or for another entity or person or appearing as a legal representative on behalf of someone else is considered the practice of law in the State of Florida. See Florida Bar v. Lister, 662 So.2d 1241 (Fla. 1995). Using a title such as "lawyer," "attorney," "attorney at law," "esquire," "counselor," or "counsel," is also considered the practice of law in the State of Florida. See Florida Bar v. Gordon, 661 So.2d 295, 296 (Fla. 1995). Plaintiff alleges that using the title "Attorney in Fact," and signing and verifying a judicial foreclosure complaint on behalf of someone else is the practice of law in the State of Florida and is not permitted unless the person or entity is licensed to practice law in the State of Florida.

154.    A power of attorney does not confer upon Wells Fargo the authority to practice law or act as an Attorney in Fact on behalf of another corporation or person, unless Wells Fargo is a licensed attorney in the State of Florida or a professional corporation comprised of only licensed attorneys as shareholders. Wells Fargo is not a professional corporation authorized to practice law in the State of Florida and is not permitted to do so unless the person or entity is licensed to practice law in the State of Florida.

155.    Wells Fargo has willfully and knowingly engaged in the unauthorized practice of law by signing and verifying the wrongful foreclosure complaints as "Attorney in Fact," in all of the foreclosure cases filed in the State of Florida for many years.

156.    It is not known the total number of wrongful foreclosure cases filed by Wells Fargo in the State of Florida between 2010 and 2018, but it is estimated to be in the hundreds or thousands and is evidence of willful violation of the Florida statute.

157.    Wells Fargo's loan documentation employees signed all the wrongful foreclosure complaints on behalf of Wells Fargo, the corporation and had attributable knowledge of the statute's prohibition via other employees in the Wells Fargo legal department.

158.    It has long been the law in Florida that a non-lawyer may not represent a corporation in court and that a corporation may not appear pro se. Szteinbaum v. Kaes Invescsiones Valores, 476 So.2d 247 (Fla. 3d DCA 1985); Nicholson Supply Co. v. First Federal Savings & Loan Association, 184 So.2d 438 (Fla. 2d DCA 1966). The rationale is that a corporation is a fictitious entity. While a natural person may represent himself in court, a corporation is not a natural person. It is an artificial entity created by law and as such it can neither practice law nor appear or act in person. Nicholson at 440; Sec. 454.18, Fla. Stat. (2007). Plaintiff alleges that under Florida law, Wells Fargo is not permitted to sign, verify and file the wrongful foreclosure complaints as "Attorney in Fact." See, e.g., Szteinbaum v. Kaes Inversiones Valores, 476 So.2d 247 (Fla. 3d DCA 1985), corporation's filing of complaint not signed by an attorney constituted the unauthorized practice of law.

159.    Wells Fargo employees cannot properly sign the complaints on behalf of or for Wells Fargo, unless they are licensed attorneys in the State of Florida. Plaintiff alleges that Wells Fargo employees have engaged in the unauthorized practice of law in Florida by signing the wrongful foreclosure complaints on behalf of Wells Fargo Bank, the corporation.

160.    Those employees, who signed the wrongful foreclosure complaints, and were not licensed Florida attorneys, have engaged in the unauthorized practice of law. See Angelini v. Mobile Home Village, Inc., 310 So.2d 776 (Fla. 1st DCA 1975), corporate official may not sign a pleading for corporation as a corporation is prohibited from the practice of law.

161.    To the extent that licensed Florida attorneys of record assisted the Wells Fargo employees in preparing, signing, verifying, and filing the wrongful foreclosure complaints, then the attorneys will be considered to have "assisted in" the unauthorized practice of law in Florida. Under Fla. Rule 4-5.5, licensed lawyers may not assist non-lawyers in the unlicensed or unauthorized practice of law.

162.    Notwithstanding the fact that Wells Fargo engaged in the unauthorized practice of law by signing and verifying all the wrongful judicial foreclosure complaints as "Attorney in Fact," in Florida, between 2010 and 2018; Wells Fargo had a duty to disclose the computer error and other related errors to Plaintiff, the Class and the courts because it acted as an attorney, Attorney in Fact or officer of the court in all the judicial proceedings.

163.    Wells Fargo's breach of its duty to disclose the errors to Plaintiff, the Class and the courts, directly and proximately caused Plaintiff's and Class Members' injuries, including but not limited to:

a.    wrongfully denied modifications, leading to wrongful foreclosures and avoidable loss of homes;

b.    lost equity in homes that were foreclosed on and the loss on average of 10 years of previously made mortgage payments;

c.    increased costs associated with lowered credit scores and increased fees and other costs to avoid or attempt to avoid foreclosure, including loans from relatives that have not been repaid.

## FIFTH CAUSE OF ACTION
### Breach Of Fiduciary Duty

(Brought On Behalf of Plaintiff and Nationwide Class)

164.    Plaintiff incorporates all allegations as if fully set forth herein.

165.    Plaintiff and Class Members are the intended third party beneficiaries of Wells Fargo's HAMP agreement (as servicer) with the U.S. Treasury Dept., which requires it to issue a mortgage modification to any borrower who met the criteria to qualify.

166.    Under Wells Fargo's HAMP agreement, Wells Fargo was paid Federal incentive payments to review modification applications and assist and modify mortgages and, otherwise, act for the benefit of the Plaintiff and Class Members, who are not signatories on the agreement but rather who benefit from the agreement as beneficiaries.

167.     Plaintiff and Class Members are also the intended third party beneficiaries of Wells Fargo's servicing agreement with lenders and investors.  Mortgage servicing functions are required and mandated by Plaintiff's mortgage and note and the new owners and investors of Plaintiff's mortgage have contracted with Wells Fargo as part of the securitization process to provide these services to Plaintiff.  Processing of mortgage modification requests are part of the loan servicing function and there is privity of contract between Plaintiff via its mortgage and note and Wells Fargo via its servicing and pooling agreement with the new owners and investors.  Wells Fargo is paid a mortgage servicing fee, collects and retains all late charges, inspection fees and legal fees it charges Plaintiff and is paid incentive payments by the U.S. Treasury under HAMP to process and modify Plaintiff's mortgage.  Wells Fargo is entitled to keep the float on the mortgage payments.  Plaintiff pays the servicer/Wells Fargo on the 1st of the month but the servicer/Wells Fargo does not remit the funds to the mortgagee until the 25th of the month.  During the interim, Wells Fargo gets to use the funds on Plaintiff's and thousands of other mortgages.  Plaintiff's and Class Members' mortgages and notes address the payment and collection of mortgage payments, late fees and legal fees by the servicer/Wells Fargo.  Wells Fargo, as servicer, is paid to process and approve Plaintiff's and Class Members' modification requests; it is not paid or compensated under HAMP, if it does not approve Plaintiff's or Class Members' modifications.  Wells Fargo, as servicer, also owes a separate duty to Plaintiff and Class Members under agency law as agent for the owners of Plaintiff's and Class Members' mortgages and notes.  Wells Fargo is paid to collect and receive mortgage payments, manage mortgage accounts and act as trustee of escrow accounts for the payment of real estate taxes, insurance, condo association assessments and other payments.  Plaintiff and Class Members relied on advice and confidential guidance from Wells Fargo in processing their modification applications, which included private and confidential financial Federal tax returns and medical information where appropriate.  The medical information submitted to Wells Fargo cannot be disclosed under the Health Insurance Portability and Accountability Act (HIPAA).  Plaintiff

responded to no less than 5 separate requests for documentation and many private medical questions regarding his modification application, which took several months. Plaintiff's medical condition met the Federal definition of a "disability" and he was a senior citizen on social security at the time of the modification application.

168.    Even though Plaintiff and Class Members are not signatories on the servicing agreement and HAMP agreement, the agreements in combination and collectively and cumulatively considered together with Plaintiff's mortgage and note, established an "implied" fiduciary relationship between Plaintiff, Class Members and Wells Fargo. Also, under Plaintiff's mortgage, Wells Fargo was paid to act as trustee of an escrow account established for the payment of real estate taxes, insurance, condo association assessments and other payments and owed a fiduciary duty to Plaintiff pursuant to the escrow agreement. Nonetheless, no formal contract or agreement is necessary to establish an implied fiduciary relationship, which is ultimately a question of fact and cannot be resolved at the motion to dismiss stage.

169.    Plaintiff and Class Members were dependent on Wells Fargo with regard to their modification requests. See *Brigham v. Brigham*, 11 So.3d 374, 387 (Fla. 3d DCA 2009) ("To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel and protect the weaker party.") *Masztal v. The City of Miami*, 971 So.2d 803, 809 (Fla. 3d DCA 2008) ("An implied fiduciary relationship will lie when there is a degree of dependency on one side and an undertaking on the other side to protect and/or benefit the dependent party.") Plaintiff and Class Members were completely reliant on Wells Fargo as servicer, to timely disburse funds to the appropriate entities out of the loan's escrow account.

170.    See *Capital Bank*, 644 So.2d 515 (Fla. 3d DCA 1994); see also *In re National Century Financial Enterprises, Inc., Investment Litigation*, 604 F. Supp. 2d 1128, 1147-48 (S.D. Ohio 2009). The fiduciary's role may be assumed by formal appointment, or it may arise de facto from a more

informal relationship between the parties and no formal contract is necessary. For the de facto status to be recognized, however, both parties must understand under the circumstances that a special trust and confidence has been reposed in one by the other.

171. See *Capital Bank*, 644 So.2d at 520 (Fla. 3d DCA 1994) ("A fiduciary owes to its beneficiary the duty to refrain from self-dealing, the duty of loyalty, the overall duty to not take unfair advantage and to act in the best interest of the other party, and the duty to disclose material facts"). The duty to disclose material facts is ultimately a question of fact and cannot be resolved at the motion to dismiss stage. See Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC, 650 F. Supp. 2d 1213, 1233 (S.D. Fla. 2009) and Razor Capital LLC v. CMAX Finance LLC, No. 17-80388, 2017 (WL 3481761 (S.D. Fla. 2017)).

172. Under the Wells Fargo servicing agreement, HAMP agreement and Plaintiff's mortgage, Wells Fargo owed a fiduciary duty to Plaintiff and Class Members to disclose the MSP computer program errors with regard to the calculation and overstatement of legal fees and other costs with regard to determining whether to issue a mortgage modification. Both Plaintiff and Wells Fargo understood that under the loan servicing agreement, HAMP, and Cal. Civ. Code § 2923.6, Wells Fargo was being compensated by the Federal government to act for the benefit of Plaintiff and modify its mortgage, if Plaintiff met all eligibility requirements; Wells Fargo had a duty to maximize net present value in its eligibility calculations and a duty to disclose the computer calculation errors, which is ultimately a question of fact.

173. Plaintiff alleges that Wells Fargo failed to disclose similar computer calculation errors and concealed and misrepresented and omitted these other errors between October 2013 and 2016, and did not notify or otherwise contact Plaintiff and many Class Members because it did not want the Federal Office of Comptroller of the Currency (OCC) to find out about these errors and other mortgage modification deficiencies during its audit. *See* Exhibit 1, pp. 30 and 31.

174. Wells Fargo admitted in its SEC filings that it knew of the material legal fee calculation errors during the period of October 2015 through 2018 but did not disclose and continued to foreclose on homes notwithstanding the fact that the modifications were wrongfully denied because of the errors.

175. Under the combination of the servicing agreement and mortgage and HAMP agreement, Wells Fargo had a fiduciary duty to disclose to Plaintiff and Class Members, the computer modification calculation errors with regard to legal fees. Additionally, Wells Fargo also had a fiduciary duty to disclose its "conflict of interest" in acting as fiduciary for both parties with regard to the modification. Wells Fargo acted in a dual fiduciary capacity as Master Servicer and Securities Administrator under its mortgage servicing and pooling agreement and acted as an implied fiduciary for Plaintiff. Wells Fargo was required to disclose to Plaintiff, its conflict of interest in acting as an implied fiduciary for Plaintiff and acting as a fiduciary for the owner of the mortgage and note and investors. Under amended Cal. Civ. Code § 2923.6, Wells Fargo, as mortgage servicer, acts in the best interests of all parties to the loan pool or investors. Plaintiff is a party to the loan pool via its 30 year note, which is an asset of the Trust J.P. Morgan Mortgage Acquisition Trust 2006-WF1 is the owner of Plaintiff's mortgage and note. Furthermore, Plaintiff is an intended third party beneficiary under Cal. Civ. Code §2923.6 and the loan servicing agreement, which is ultimately a question of fact.

176. Wells Fargo breached all of the above fiduciary duties of disclosure to Plaintiff and Class Members causing injuries to Plaintiff and Class Members, which included the denial of modifications and loss of homes to foreclosure because of the wrongful modification denials.

177. Plaintiff and Class Members were unable to timely review and correct material calculation errors because of Wells Fargo's breach of its fiduciary duty to disclose.

178. Plaintiff and Class Members reasonably relied to their detriment (leading to foreclosure) on Wells Fargo's wrongful HAMP modification denials caused by the computer errors in calculating and estimating the legal fees and other foreclosure costs, in determining eligibility for a modification.

CLASS ACTION COMPLAINT
                                                          kh@khudsonlaw.com

179.    Plaintiff and Class Members could not have discovered the material computer calculation errors by way of the normal due diligence process.

### SIXTH CAUSE OF ACTION
### Fraudulent Concealment

(Brought On Behalf of Plaintiff and Nationwide Class)

180.    Under California law, the tort of deceit or fraud by concealment requires that each and all of the following elements be proved:

    a.    "the defendant must have concealed or suppressed a material fact,

    b.    the defendant must have been under a duty to disclose the fact to the Plaintiff,

    c.    the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the Plaintiff,

    d.    the Plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and

    e.    as a result of the concealment or suppression of the fact, the Plaintiff must have sustained damage."

> *Boschma v. Home Loan Center, Inc.*, (2011) 198 Cal.App.4th 230, 248, see also *Mosier v. Southern California Physicians Ins. Exchange* (1995) 63 Cal.App.4th 1022, 1045.

181.    There are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the Plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the Plaintiff; (3) when the defendant actively conceals a material fact from the Plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts... Each of the circumstances in which nondisclosure may be actionable presupposes the existence of some other relationship between the Plaintiff and defendant in which a duty to disclose can arise.

CLASS ACTION COMPLAINT
kh@khudsonlaw.com

182.    Such a relationship can only come into being as a result of some sort of transaction between the parties...Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances." (*Limandri v. Judkins* (1997) 52 Cal.App.4th 326, 336-337.)  The servicing agreement and HAMP agreement, in combination with and collectively with Plaintiff's mortgage and note, established an "implied" fiduciary relationship between Plaintiff, Class Members and Wells Fargo.

183.    A recent decision of the United States District Court for the Southern District of New York addresses circumstances under which a defendant has a duty to disclose truthful information affirmatively, even without a special relationship such as a fiduciary relationship.  See *Plumbing Supply, LLC v. Exon Mobile Oil Corp.,* 14 CV 3674, NYLJ 1202797948513, at 1 (SDNY, Decided September 5, 2017).

184.    Wells Fargo misrepresented to Plaintiff and Class Members that they did not qualify for a HAMP modification and Plaintiff and Class Members relied to their detriment on Wells Fargo's misrepresentations; their modifications were denied and many homes lost to foreclosure.

185.    Once Wells Fargo discovered the computer calculation errors and that modifications had been wrongfully denied, it knowingly concealed and continued to deny modifications and continued to foreclose on homes for 5 years (from 2013 through 2018), without notifying or contacting or disclosing the MSP material computer calculation errors to Plaintiff, the Class Members and the courts during the judicial foreclosure proceedings and before the Iowa Rico class action Settlement.  Plaintiff would not have opted out of the Iowa Rico case if it had known of the concealment fraud.  Instead, he would have amended the complaint.

186.    Under New York fraud law, a duty to disclose arises and cannot be concealed or omitted if, one party makes a material representation that requires additional disclosure to avoid misleading the other party.  A fiduciary or other special relationship is not required.  See above Plumbing Supply case.

187.    If Plaintiff had known of the concealment fraud or been notified of the material computer calculation errors regarding the modification denial, it would have amended its affirmative defense and restated and refiled its counterclaim regarding the denial of its modification during the Florida judicial foreclosure case proceedings and refiled and repled, as an independent action its Rico claim in the Florida proceedings and Iowa Rico case.

188.    If Plaintiff had known of the concealment fraud or been notified of the material computer calculation errors with regard to legal fees and other costs, Plaintiff would have compelled the servicer and the owner of the note to enforce the terms of the note's due on sale clause with regard to sale of the property at the association's foreclosure sale to prevent transfer of the property to the tax buyer.  The first mortgage lien holder and owner of the note and Wells Fargo, owed a fiduciary duty to Plaintiff to protect its ownership interests and the interests of the noteholder in the property by redeeming the property within 10 days after the Association's foreclosing sale of the property for $17,200 on May 27, 2015, for non-payment of assessments.

189.    If Plaintiff had known of the concealment fraud, it would have notified the circuit and appellate courts of Wells Fargo's fraud and conflict of interest during the judicial foreclosure proceedings before the circuit and appellate courts in Florida, with regard to the property and wrongful modification denial.  Wells Fargo acted as "attorney in fact" during the judicial foreclosure proceedings and violated its duty of disclosure to Plaintiff and the Florida state courts.

190.    Wells Fargo's concealment fraud was the direct and proximate cause of Plaintiff and Class Members' injuries, including loss of homes to foreclosure.

191.    As a consequence of Wells Fargo's concealment fraud, Plaintiff and Class Members were injured in many ways, including but not limited to:

a.    wrongful association foreclosure and mortgage foreclosures and wrongful mortgage modification denials;

b.    lost equity in homes that were foreclosed on and the loss on average of 10 years of previously made mortgage payments;

c.    significant stress causing physical injuries and emotional distress, especially to Class Members who were disabled or retired, including Plaintiff, whose medical conditions meet the Federal definition of a disability under the Americans With Disabilities Act (ADA).

192.    Plaintiff and Class Members will request an award of punitive damages at trial for Wells Fargo's knowing and intentional concealment fraud with regard to the overstatement of legal fees and other costs, in determining eligibility for a mortgage modification.

193.    Wells Fargo discovered the computer modification software error in 2013, not 2015 and deliberately did not disclose or tell Plaintiff and Class Members because it did not want the OCC to find out about the error during its audit investigation of Wells Fargo.

194.    Wells Fargo knowingly, willfully, intentionally, and continually concealed three (3) material software modification calculation errors from Plaintiff and Class Members between 2013 and 2018 to prevent an increase of the civil monetary penalty of $70 million dollars levied against it by the OCC on May 24, 2016. This multiple year pattern of concealment is evidence of intent and shows why Wells Fargo did not disclose the larger 2013 error until 2018. Wells Fargo engaged in an active and willful pattern of concealment of the computer calculation errors to elude discovery by the OCC's 2011 audit investigation of deceptive practices, *See* Exhibit 1, p. 30, and to prevent additional monetary penalties from being levied against it. In other words, its fraudulent concealment went beyond mere non-disclosure and constituted active and willful concealment. Licul v. Volkswagen Group of Am., Inc.

1    No. 133-61686-CTV, 2013 WL 6328734, at * 6 (S.D. Fla. Dec. 5, 2013); see also Nardone, 333 So. 2d

2    at 39 ("generally the fraud must be of such a nature as to constitute active concealment to prevent

3    inquiry or elude investigation or to mislead a person who could claim a cause of action"). Wells Fargo's

4    pattern of intentional active concealment from Plaintiff and Class Members of the MSP computer

5    program mortgage modification errors in this case, is also demonstrated by its non-disclosure of these

6    same errors between 2013 and 2016, in Plaintiff's Rico Case No. 4-08-CV-507, in the United States

7

8    District Court, Southern District of Iowa. Plaintiff's Rico case (2008-2016) involved similar MSP

9    computer errors with regard to illegal late fees charged and inspection fees for home inspections not

10   performed. Additionally, Wells Fargo also intentionally and actively concealed these same computer

11   modification errors from the New York Attorney General in its 2013 case against Wells Fargo to enforce

12   the National Mortgage Settlement of 2012 and force Wells Fargo to honor its agreement to provide 4.34

13
     billion dollars in mortgage modification relief to class Members (including Plaintiff), which it did not
14
     completely do. Until 2017, Wells Fargo had a policy allowing it to misuse the attorney-client privilege
15

16   to hide and conceal documents from Plaintiff, the public, its regulators and board; it withheld board

17   minutes and emails from Grant Thornton, its independent consultant and auditor, tasked under a consent

18   order with evaluating Wells Fargo's various practices and informing the compliance plan. Wells Fargo

19   rescinded the policy only after the OCC discovered it. *See* Exhibit 1, p.43.

20
                          **SEVENTH CAUSE OF ACTION**
21                   **Fraud On The Florida State And Appellate Courts**

22                (Brought On Behalf of Plaintiff and Florida Subclass)

23       195.    Plaintiff incorporates by reference the above allegations as if fully set forth herein.

24       196.    Fla.R.Civ.P. 1.540(b) and Fed.R.Civ.P. 60(b) are virtually identical and both do not limit
25
     the power of a court to entertain and independent action to relieve a party from a judgment or to set
26
27   aside a judgment for fraud upon the court.

28

CLASS ACTION COMPLAINT
                                                                      kh@khudsonlaw.com

197.    Fed.R.Civ.P. 60(b) was the historical basis for Fla.R.Civ.P. 1.540(b) and the treatment by federal courts of the Federal rule has a persuasive impact on the interpretation of the Florida rule by Florida courts. *See* Willis, Post-Judgment Relief Under Rule 1.38, 40 Fla. B.J. 1042 (1966). In commenting on the predecessor to Rule 1.540, Judge Willis suggested that "our Rule 1.3.8(b) is taken from Rule 60(b) of the federal rules and cases digested under this rule certainly would be very persuasive and perhaps controlling in a Florida court." Id. at 1045.

198.    Wells Fargo perpetuated a fraud on the Florida Court by unfairly hampering the presentation of Plaintiff's and Class Members' claims and defenses with its fraudulent concealment and nondisclosure of the MSP computer modification calculation errors during the foreclosure proceedings against Plaintiff and Class Members. SEE FIFTH CAUSE OF ACTION and SIXTH CAUSE OF ACTION.

199.    Additionally, Wells Fargo also perpetuated a fraud, on the Florida Court during Plaintiff and Class Members' foreclosure proceedings when it fraudulently violated the unauthorized practice of law; it verified all the Florida judicial foreclosure complaints as Attorney-in-Fact for the owner/investor of the mortgages, which is a criminal violation of Fla. Stat. Section 454.23 (2012).

200.    Once Wells Fargo discovered the computer calculation errors in 2013 and that modifications had been wrongfully denied, it knowingly concealed and continued to deny modifications and continued to foreclose on homes for years (from 2013 through 2018), without notifying or contacting or disclosing the MSP material computer calculation errors to Plaintiff, the Class Members and the courts during the Florida judicial foreclosure proceedings.

201.    Wells Fargo's concealment fraud and non-disclosure hampered the presentation of Plaintiff's and Class Members' claims and defenses because Plaintiffs would have pursued the denial of their modification requests as independent actions, if they had known about the concealment fraud.

Perrine v. Henderson, 85 So.3d 1210, 1211-22 (Fla. 5th DCA 2012) quoting Cox v. Burke, 706 So.2nd 43, 46 (Fla. 5th DCA 1988).

202.   All of the judicial foreclosure complaints verified by Wells Fargo as Attorney-in-Fact in the State of Florida are not allowed unless the person or entity is licensed to practice law in the State of Florida.

203.   The willful and knowing unauthorized practice of law by Wells Fargo before the Florida State and Appellate Courts is a felony of the third degree and fraud upon the Florida Courts.

204.   When Wells Fargo, the corporation willfully and knowingly verified the foreclosure complaint in Plaintiff's foreclosure case #2015-CA-01942, Florida's Seventeenth Judicial Circuit Court, Civil Division, it engaged in fraud on the Florida Court.

205.   When Wells Fargo's loan documentation employee verified Plaintiff's foreclosure case complaint as Attorney-in-Fact, they engaged in fraud on the Florida Court because they are not licensed Florida attorneys.

206.   The licensed Florida attorneys of record, who assisted the Wells Fargo employees in verifying Plaintiff's judicial foreclosure complaint, have engaged in fraud on the Florida Court.  Under Fla. Rule 4-55, licensed Florida lawyers may not assist non-lawyers in the unlicensed or unauthorized practice of law.

207.   The United States Court of Appeals for the Sixth Circuit has set forth five elements of fraud upon the court which consist of conduct: "1. On the part of an officer of the court; 2. That is directed to the 'judicial machinery itself;' 3. That is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth; 4. That is a positive averment or is concealment when one is under a duty to disclose; 5. That deceives the court." Demjanjuk v. Pegtrovsky, 10 .3d 338, 348 (6th Cir. 1993).

208.   Other United States Court of Appeals, expressly require that fraud upon the court must involve an officer of the court and the Ninth Circuit notes that fraud upon the court occurs when an

CLASS ACTION COMPLAINT

kh@khudsonlaw.com

officer of the court perpetrates fraud affecting the ability of the court to impartially judge a case. Pomphrey v. Thompson Tool Co., 62 F.3d 1128, 1130 (9th Cir. 1995).

209. The licensed Florida attorneys of record in Plaintiff's Florida foreclosure case who assisted Wells Fargo employees in verifying the foreclosure complaint as Attorney-in-Fact are implicated as officers of the court in the unauthorized practice of Florida law and this will constitute fraud upon the court, Rozier v. Ford Motor Co., 573 F.2d 1332, 1338 (5th Cir. 1978).

210. Notwithstanding its unauthorized practice of law, Wells Fargo had a duty to disclose the MSP computer calculation errors to the Florida court, when it acted as Attorney-in-Fact or officer of the court in Plaintiff's foreclosure case. Wells Fargo had a policy allowing it and its licensed Florida foreclosure attorneys to misuse the attorney-client privilege to hide, conceal and not disclose the MSP computer calculation errors from the OCC, Plaintiff, Class Members and ultimately the Florida Courts. The policy was rescinded by Wells Fargo in 2017. *See*, Exhibit 1, p. 43, this rescission of the policy constitutes a voluntary waiver of the attorney-client privilege by Wells Fargo with regard to the relevant matters at issue, including any internal investigations related to the MSP computer calculation errors and the unauthorized practice of law. Wells Fargo risks criminal prosecution if it does not come clean and voluntarily waive the attorney-client privilege as to any internal investigations into the computer calculation errors, unauthorized practice of law or unauthorized opening of bank accounts. *See* Exhibit 2, pp 4-8. It is not clear whether the Federal criminal investigation of Wells Fargo looked into the MSP computer calculation errors and unauthorized practice of law. *See* Exhibit 2.

211. Wells Fargo as Attorney-in-Fact and officer of the court and as a party litigant had a duty of full disclosure and honesty with the Florida State and Appellate courts. See Model Rule of Professional Conduct r.3.3 (AM BAR ASSN'N 1983).

212.    When an officer of the court (Wells Fargo) neglects its duty to disclose and obtains a fraudulent judgment, the judgment may be attacked and subsequently overturned as fraud on the court. See H. K. Porter Co. v. Goodyear Tire & Rubber Co., 536 F. 2d 1115, 1119 (6th Cir. 1976).

213.    If there had been disclosure and no fraud on the Florida court, Plaintiff would have pursued the denials of all mortgage modification requests (HAMP, HARP and the National Mortgage Settlement Agreement of 2012), as independent actions.

214.    Pursuant to Fed. R. Civ. P. 60(d)(3), Plaintiff requests that the foreclosure judgment obtained by Wells Fargo and entered on March 21, 2017 in case number 2015-CA-01942, Florida's Seventeenth Judicial Circuit Court, Civil Division, be reopened and overturned and vacated because it was procured by fraud upon the court.

## EIGHT CAUSE OF ACTION
## Concealment Fraud And The California and Iowa Federal Courts

(Brought On Behalf Of Plaintiff and Nationwide Subclass)

215.    Plaintiff incorporates by reference the above allegations as if fully set forth herein.

216.    Wells Fargo engaged in a pattern of concealment fraud and racketeering offenses, as evidenced by its concealment fraud in Plaintiff's Rico Case No. 4-08-CV-507, in the U.S. District Court, Southern District of Iowa, a case initially commenced in California.

217.    Plaintiff's Rico case involved MSP computer calculation errors by Wells Fargo pertaining to late fees and home inspection fees illegally charged and this case involves the same or substantially similar MSP computer calculation errors by Wells Fargo.

218.    When Wells Fargo discovered the current mortgage modification MSP computer calculation errors with regard to legal fees, it owed a fiduciary duty to Plaintiff and the California and Iowa Federal Courts to disclose it in Plaintiff's Rico case rather than conceal it because Wells Fargo acted as a fiduciary with regard to Plaintiff's modification requests. See Fifth and Sixth Causes of Action.

219.    Wells Fargo breached its duty of disclosure in Plaintiff's Rico case and this constitutes concealment fraud on Plaintiff and the California and Iowa Federal courts and is evidence of a pattern of such fraudulent and intentional offenses and misuse of the attorney-client privilege. See Seventh Cause of Action and Exhibit 1, p.43.

220.    But for the concealment fraud upon Plaintiff and the California and Iowa Federal courts, Plaintiff and other Class Members would not have opted out of the court settlement agreement on February 17, 2016 and would have pursued their Rico complaint.

221.    Pursuant to Fed. R. Civ. P. 60(d)(3), Plaintiff requests that the opt outs be rescinded and vacated with respect to Plaintiff and all Class Members who opted out of the settlement. There were 219 Class Members who opted out of the settlement agreement of February 17, 2016.

## PRAYER FOR RELIEF/FIRST THROUGH EIGHT CAUSES OF ACTION

WHEREFORE, Plaintiff, on behalf of himself and all Class and SubClass Members, requests judgment be entered against Defendant and that the Court grant the following:

a.    An order determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff is a proper class representative, that Plaintiff's soon to be retained attorneys, be appointed class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, and that the class notice be promptly issued;

b.    Appropriate declaratory relief against Defendant;

c.    Preliminary and permanent injunctive relief against Defendant;

d.    An award of all applicable damages; including compensatory, treble and punitive damages and the payment of restitution for the unauthorized practice of Florida law;

e.    An award of reasonable attorney's fees and other litigation costs reasonably incurred; and

f.      Any and all relief to which Plaintiff and the Class may be entitled, including disgorgement of Defendant's mortgage servicer fees and revenue because of its various conflicts or interest and for breach of its implied fiduciary duty.

g.      Judgment against Defendant for Plaintiff and Class Members' asserted causes of action, including an order and judgment under F.R.C.P. (60)(d)(3) vacating the judgment of foreclosure entered on March 21, 2017, in Florida's Seventeenth Judicial Circuit Court, Civil Division, Case # 2015-CA-019042, because it was procured by fraud upon the court;

h.      An order pursuant to Fed.R.Civ.P.60(d)(3), recinding and vacating Plaintiff's and SubClass Members' opt outs of the RICO settlement agreement of February 17, 2016 because of Defendants' concealment fraud on Plaintiff and the California and Iowa Federal Courts.

## NINTH CAUSE OF ACTION
## Revival of Plaintiff's And SubClass Members' Rico Complaint

(Brought On Behalf Of Plaintiff and Nationwide Subclass)

222.    Plaintiff incorporates by reference the above allegations as if fully set forth herein.

223.    If Wells Fargo had disclosed and not concealed the MSP computer calculation errors regarding legal fees in 2013 and 2015, Plaintiff and Opt Out SubClass Members would have pursued their initial RICO complaint regarding inspection fees. Therefore, Plaintiff and Opt Out SubClass Members are hereby reviving and refiling their RICO complaint regarding inspection fees.

224.    Wells Fargo finally disclosed in late 2018 the MSP computer calculation errors with regard to legal fees and Plaintiff's modification request and Plaintiff discovered the current RICO related injury at that point in time. Most Federal Courts apply only the injury discovery rule with regard to the 4 year RICO statute of limitations, which has not run here.

225.    Additionally, Wells Fargo's MSP computer calculation errors disclosed with regard to legal fees and late fees are the same or substantially the same as the MSP computer calculation errors with regard to fraudulent inspection fees and late fees that were pending in Plaintiff's RICO Case No. 4-

CLASS ACTION COMPLAINT
kh@khudsonlaw.com

08-CV-507, in the U.S. District Court, Southern District of Iowa, at the time of the Feb. 17, 2016 settlement agreement and opt out by Plaintiff and other Class Members.

226.    Plaintiff's newly discovered RICO injury pertaining to the MSP computer calculation errors related to its modification request and legal fees is also from the same pattern of RICO racketeering conduct by Wells Fargo.

227.    Plaintiff's MSP computer calculation error regarding legal fees and its modification request is a late developing and newly discovered RICO injury that could not have been proven during Plaintiff's initial RICO litigation because of the concealment fraud by Wells Fargo. *See* SIXTH CAUSE OF ACTION.

228.    Plaintiff has incorporated and included the newly discovered RICO injury pertaining to the MSP computer calculation errors regarding legal fees into the following revived RICO complaint that is being refiled because of concealment fraud on Plaintiff and the California and Iowa Federal courts. *See* EIGHT CAUSE OF ACTION.

229.    This case seeks to put an end to the equivalent of price-gouging by Wells Fargo & Co. and Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendants") at the expense of vulnerable homeowners. Specifically, as set forth more fully below, Wells Fargo engaged in a fraudulent scheme in violation of federal and state law, assisted by a nationwide web of outside vendors who acted in concert with Defendants to perpetrate the scheme, to exact improper inspection fees and late charges from homeowners who had fallen into arrears on their mortgages and to improperly and intentionally deny mortgage modification requests because of a faulty computer program calculation of legal fees.

230.    These additional costs, which this action seeks to recover, placed Plaintiff and other borrowers whose mortgages were serviced by Wells Fargo in difficult financial straits, putting their homes in jeopardy and, in some instances, resulting in bankruptcy. *See e.g. In re Dorothy Chase Stewart*, No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008) ("*Stewart*") (stating that

CLASS ACTION COMPLAINT
kh@khudsonlaw.com

Wells Fargo's bogus fees and other misconduct forced homeowner into bankruptcy). Plainitff now seeks return of these inflated bogus inspection costs and late fees and seeks approval of its illegally denied mortgage modification request.

231.    In particular, Wells Fargo utilized a computer system to automatically assess fees for late payments and property inspections without regard to the terms of the borrowers' mortgage loans or the relevant circumstances. Instead of being based upon reasonable parameters, the computer system was programmed to assess as many charges as possible and to pay first all outstanding fees and costs before satisfying interest and principal. Further, Wells Fargo concealed the nature of the fees being assessed on monthly statements mailed to Plaintiff and Class Members by describing them simply as "other" charges. In this matter, Wells Fargo victimized and further increased the indebtedness of persons who were already in danger of losing their homes to foreclosures. Well Fargo's scheme has been ongoing for years and was in existence when Plaintiff and Class Members obtained their mortgages.

232.    Wells Fargo's misconduct has not gone unnoticed. The United States Bankruptcy Court for the Eastern District of Louisiana issued an opinion sanctioning Wells Fargo for its unlawful conduct at issue here. *See In re Dorothy Chase Steward*, No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008) ("*Stewart*").

233.    In *Stewart*, the court found that Wells Fargo's unlawful, automated practice of charging fees to distressed borrowers had resulted in the assessment of multiple late fees for a single missed payment as well as assessment of an inspection fee on average once every month and a half over a seven year period, deepening the debtor's default although the borrower's property always had been occupied and in good condition. Moreover, the inspections generated by Wells Fargo's automated system were never read or reviewed by any Wells Fargo employee, further demonstrating that the inspections were simply a profit-generated mechanism and were not necessary to safeguard the lender's interests.

234.    As held by the Honorable Elizabeth W. Magner in the Wells Fargo foreclosure matter at issue in *Stewart*:

> The Court concludes ... that Wells Fargo has a corporate practice that fails to notify borrowers that fees, costs, or charges are being assessed against their accounts.
>
> Wells Fargo's [conduct is] abusive behavior ... in particular, the abusive imposition of unwarranted fees and charges (late fees and inspection costs).

*Id.* at 342.

235.    In addition, the Senate Judiciary Subcommittee on Administrator Oversight and the Courts convened a hearing to consider allegations that mortgage lenders and mortgage servicing companies, including Wells Fargo have deepened the foreclosure crisis and improperly used the bankruptcy system to collect unwarranted and unreasonable fees. In his opening statement, Senator Charles E. Schumer aptly observed that, as a result of these unlawful practices, vulnerable homeowners trying desperately to stay afloat are instead suffering a "death by a thousand fees."

236.    Wells Fargo has profited enormously from this fraudulent scheme. As the *Stewart* court observed, Wells Fargo's assessment of late and inspection fees on home mortgage loans it services generates hundreds of millions of dollars in revenue for Wells Fargo.

237.    Plaintiffs have brought this action to put an end to Wells Fargo's scheme and to recover the improper, unwarranted and unreasonable fees charged to and paid by Plaintiff and Class Members.

238.    As alleged below in detail Wells Fargo's misconduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq* and California's state consumer protection laws under the California Business & Professions Code, §§ 17200, *et seq*.

239.    This Court has jurisdiction over the RICO matter of this action pursuant to 18 U.S.C. §§ 1961, 1962 and 1964, 28 U.S.C. §§ 1331, 1332 and 1367, and 15 U.S.C. §§ 15. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d). Diversity of jurisdiction is also conferred over this class action pursuant to the Class Action Fairness Act of 2005 ("CAFA"). It is appropriate to apply the California UCL to protect a nationwide class because the wrongdoing alleged

herein occurred in significant part in California, and Wells Fargo has its principal place of business within the state of California and does business in all 50 states.

240.    Venue is proper in this district pursuant to 18 U.S.C. 1965(a), 28 U.S.C. § 1391(b), 15 U.S.C. § 22, and 28 U.S.C. § 1391 because Wells Fargo, is found, does business and transacts business within this district, and Wells Fargo conducts the interstate trade and commerce described below in substantial part within this district. Additionally, other relevant or related class action matters are pending in this district. *See* Case No. 3:318-CV-07354-WHA.

241.    During all or part of the period in which the events described in this Complaint occurred, Wells Fargo and its vendors participated in a scheme to defraud Plaintiff and other Members of the Class in a continuous uninterrupted flow of interstate commerce.

242.    The activities of Wells Fargo and its vendors were within the flow of, and had a substantial effect on, interstate commerce.

243.    Plaintiff, Kurt Hudson, is a current resident of Illinois, who owned a retirement home and resided in Florida during the relevant time period.

244.    Defendant Wells Fargo & Co. is a diversified financial services company headquartered in San Francisco, California that provides banking, insurance, investments, mortgage banking and consumer finance through banking stores, the internet and other distribution channels to customers, businesses and other institutions in all 50 states and in other countries. Wells Fargo & Co. is the parent corporation of Defendant Wells Fargo Bank, N.A. Wells Fargo & Co. exercises specific and financial control over the operations of Defendant Wells Fargo Bank, N.A., dictates the policies and practices of Wells Fargo Bank, N.A., exercises power and control over the specific activities upon which the claims herein are based, and is the ultimate recipient of the ill-gotten gains described herein. Wells Fargo & Co. represents on its website at http://www.wellsfargo.com/_jumpmortgageprinciples that it controls and sets the standard for its loan servicing business stating that:

Wells Fargo & Company Responsible Servicing Principles for U.S. Residential Real Estate Lending...Wells Fargo's vision to satisfy all our customers' financial needs...Similarly, we have long adhered to [] responsible servicing practices...

245. Defendant Wells Fargo Bank, N.A., is a subsidiary of Wells Fargo & Co. Wells Fargo Bank, N.A. is a national association with corporate offices in California. Wells Fargo Bank, N.A. conducts mortgage servicing operations in all 50 states. During the Class Period, the Plaintiff's mortgages were serviced by Wells Fargo Bank, N.A. but Wells Fargo & Company controlled and set the standards for the loan servicing business (per its website).

246. Every home mortgage contains provisions specifying when payments are due and when they are considered late, and providing that only reasonable fees may be assessed if payments are not timely.

247. As set forth in more detail below, the Plaintiff's mortgage payments were due the first of each month and were considered late if they were not received by Wells Fargo by the end of fifteen calendar days after the date they were due. In the event of a late payment, the Plaintiff's note provided that a single late charge in the amount of 5% of the overdue payment would be assessed. The Plaintiff's mortgage further permitted Wells Fargo or its agents to do and pay for whatever is reasonable or appropriate to protect the Lender's interest in the Property. Upon information and belief, in these respects, Plaintiff's note was substantially identical to the note of the debtor in the *Stewart* case.

248. The vast majority of borrowers make their monthly mortgage payments to mortgage servicing companies such as Wells Fargo rather than their original lender or the current holder of the mortgage note. In this case, Wells Fargo was also the original lender. Wells Fargo services 10.3 million residential mortgage customers or 1 out of 7 mortgages in America, making it one of the largest home mortgage services in the United States.

249. As part of its mortgage servicing operations, Wells Fargo collects monthly payments from borrowers consisting of principal and interest, taxes and insurance, and other fees and charges that

CLASS ACTION COMPLAINT

kh@khudsonlaw.com

may have been assessed and disburses these payments to the appropriate parties such as lenders, investors, taxing authorities, insurers, and other relevant persons and has an implied fiduciary relationship with Plaintiff. *See* FIFTH CAUSE OF ACTION.

250.    Wells Fargo earns revenue from mortgage loan servicing in three ways. First, Wells Fargo receives a fixed fee for each loan which is determined by the servicing agreements between Wells Fargo and the investors or note holders. Second, Wells Fargo earns "float" income from accrued interest between when mortgagors pay and when those funds are remitted to lenders, investors, taxing authorities, insurers, and other relevant parties. Third, Wells Fargo retains all, or part, of certain fees such as late charges paid by mortgagors.

251.    Because Wells Fargo earns "float" income on funds held and retains all or part of certain fees that borrowers must pay, Wells Fargo has an incentive to impose additional fees on Plaintiff; Wells Fargo has a conflict of interest in this regard.

252.    Since at least 2001, Wells Fargo has managed and administered its residential mortgage servicing tasks through the use of general computer software packages with little or no human intervention.

253.    Entries on home loan accounts serviced by Wells Fargo are tracked with a licensed computer software platform known as Fidelity Mortgage Servicing Package (also known as "Fidelity MSP"). When Wells Fargo receives a payment for a mortgage loan account from a borrower, that payment is entered into the Fidelity MSP software and the payment is deposited. Fidelity MSP then applies the payment to the borrower's account.

254.    Fidelity MSP will apply computer logic to certain events, triggering automatic action on the loan file. More particularly, guidelines for the management of loans serviced by Wells Fargo - e.g., when late fees are due - are imported into Fidelity MSP's internal logic and automatically applied. Other charges and fees, such as fees for property inspections, are assessed against the account by virtue of

Page 58 of 79

CLASS ACTION COMPLAINT

kh@khudsonlaw.com

"wrap around" software packages maintained by Wells Fargo. These software packages interface with Fidelity MSP and also implement decisions on the loan file based on internal computer logic.

255.    If a borrower is late making a payment, Wells Fargo's computer system will automatically order a property inspection and charge the borrower's account for this inspection after the loan has been in default for a certain number of days regardless of whether there is reasonable need for an inspection. In most cases, the computer system will automatically recommend a property inspection if the borrower has been in default for between 20 to 45 days.

256.    Wells Fargo's computer system automatically generates work orders for property inspections without human intervention. No person or employee of Wells Fargo is involved in the determination of whether a property inspection is reasonably necessary to protect the lender's interest in the property.

257.    The Fidelity MSP system transmits property inspection work orders to one of at least three approved vendors with which Wells Fargo has an agreement. These vendors include First American Real Estate Information Services, Inc, Fidelity National Financial, Inc., and Mortgage Contracting Services, LLC. Additionally, Black Knight, Inc. is Wells Fargo's vendor in Jacksonville, FL., who provided the MSP computer software for mortgage modifications. The software overstated legal fees in calculating net present value and denied mortgage modifications that should not have been denied resulting in foreclosures. Wells Fargo concealed the miscalculations for 5 years after discovery (from 2013 until 2018). The Black Knight, Inc. MSP computer software for mortgage modification operates the same way as the Fidelity MSP system for property inspections and late fees.

258.    Once the approved vendor received the computer generated work order, the inspection is performed and the cost is charged to the borrower's account.

259.    The vendor uploads a finished property inspection report directly into Wells Fargo's computer mainframe. Therefore, the computer system, rather than any person, checks the condition of the property and alerts Wells Fargo if a property is at risk.

260.    After the first property inspection is "triggered" by a default, the Wells Fargo computer system will continue to order property inspections every 20 to 45 days until the borrower cures the default. For example, if a borrower misses one month's periodic payment, but continues to consistently make monthly periodic payments thereafter, he or she is considered by Wells Fargo to be in default on the loan until the initial default is cured. Therefore, although a borrower continues to make regular periodic payments after having only missed one month's payment, the Wells Fargo computer system will continue to automatically generate work orders for property inspections until the initial default is cured.

261.    Further, because the property inspections are ordered based on a computer program rather than human decision-making, property inspections may be performed on a borrower's property regardless of the fact that the property has already been inspected numerous times and was previously deemed occupied, well-maintained and in good condition.

262.    Wells Fargo's practices with respect to property inspections are in stark contrast to the Federal Housing Administration's guidelines for property inspections on homes that are federally insured. FHA guidelines provide that a mortgage servicer should perform and can be reimbursed for one (1) initial property inspection that should be conducted if a mortgagor's payment is not received within 45 days of the due date and efforts to reach the borrower by telephone are unsuccessful. If the initial property inspection reveals that the property is occupied or if occupancy is confirmed through another method (i.e., the borrower makes a payment or contact is made by telephone), FHA guidelines state that the mortgage servicer will not be reimbursed for any additional inspections and additional inspections are not required. Wells Fargo, in contrast, allows property inspections to be conducted every 20 to 45

days until a borrower cures a default regardless of whether the previous inspection revealed that the house was occupied and well maintained, regardless of whether Wells Fargo has made contact with the borrower through telephone or other means, and regardless of whether the borrower continues to make payments,

263.    Wells Fargo regularly conducted its mortgage servicing operations by designing, operating and managing the Fidelity MSP computer software to intentionally charge borrowers unreasonable, improper and unlawful fees and to intentionally miscalculate net present value and deny mortgage modifications.

264.    The Fidelity MSP system was designed and operated in a centralized fashion to defraud thousands of borrowers that had their mortgages serviced by Wells Fargo.

265.    As the United States Bankruptcy Court for the Eastern District of Louisiana held in Stewart, Wells Fargo's practice of using computer software to automatically trigger property inspections once a borrower is a certain number of days in default - and to continuously order those inspections thereafter until the default is cured - is neither reasonable nor appropriate as this practice is not designed to protect the lender's interest in the property. Rather, these automatic inspections are actually conducted to generate additional fees and thereby create more "float" income, boosting Wells Fargo's bottom line.

266.    That these computer-generated inspections are unreasonable, confer no benefit on the lender, and serve no discernible purpose other than to generate revenue for Wells Fargo is further evidenced by the limited nature of the inspections themselves. The property inspections ordered by the Wells Fargo computer system are mere "drive-by" inspections, i.e., the inspector "drives by" the property ostensibly to assess whether the house is occupied, being maintained, and has not been damaged - a practice that provides little, if any, real opportunity to determine whether the lender's interest in the property is at risk. Indeed, Wells Fargo personnel do not read the inspection reports. Rather, electronic files of property inspections are stored in the Property Management Department of

Wells Fargo but are never read by anyone at Wells Fargo. As a result, the observations contained in the initial inspection have absolutely no bearing on whether another inspection will be ordered in 20 or 45 days. Also, Plaintiff's property was a condo located in a 10 story secure building containing 98 other units. A drive by cannot determine if the property is occupied or at risk.

267. As part of its scheme to generate fees, Wells Fargo repeatedly sent to Plaintiff and Class Members materially false and misleading agreements, contracts and monthly mortgage statements by mail and wire. Wells Fargo's scheme was also designed to conceal its existence. Specifically, Wells Fargo conceals the nature of the improper and unlawful inspection fees from borrowers by listing them on the borrower's statement only as "other charges."' Wells Fargo also concealed the computer miscalculations of legal fees regarding Plaintiff's mortgage modification for 5 years.

**The Named Plaintiff Has Been Victimized by Wells Fargo's Scheme**

268. On August 31, 2005, the Plaintiff purchased a retirement condo located in Hillsboro Beach, Florida, and entered into a mortgage agreement with Wells Fargo Bank, N.A. to borrow money for the purchase of the home.

269. The Plaintiff's mortgage agreement with Wells Fargo permits Wells Fargo or its agents to do and pay for whatever is reasonable or appropriate to protect the Lender's interest in the Property.

270. Plaintiff's mortgage loan was serviced by Defendant Wells Fargo Bank, N.A. through is mortgage servicing division.

271. Each month the Plaintiff received a monthly mortgage statement through the U.S. mail reflecting the amount of the current payment due and the amount of any payment remitted by the Plaintiff and received by Wells Fargo since the prior month's statement.

272. Over the life of the loan, the Plaintiff occasionally faced difficulty making timely payments on his loan. During these times, the Plaintiff continued to consistently make monthly payments in an effort to cure his default, yet the monthly statements received by the Plaintiff after

missing a payment reflected additional amounts owed in fees that were unlawfully assessed by Wells

Fargo pursuant to the fraudulent scheme alleged herein.

273.    In this regard, the Plaintiff was charged fees for a property inspection when his loan was

past due, but Wells Fargo continued to order property inspections on his home in the months thereafter

even though the Plaintiff continued to make payments every month and continuously occupied the

home.

274.    Specifically, in 2013, 2014 and 2015, Plaintiff was unable to pay his monthly periodic

payment. The Plaintiff eventually made the payments but Wells Fargo charged the Plaintiff for a

property inspection fee. Thereafter, Wells Fargo continued to charge the Plaintiff for property

inspections even though he continued to make payment. The Plaintiff was charged a property inspection

fee of $15.00 for the years 2013, 2014 and 2015 as follows:

| **2013** | **2014** | **2015** |
|---|---|---|
| January 29, 2013 | May 6, 2014 | January 6, 2015 |
| February 15, 2013 | June 9, 2014 | January 21, 2015 |
| June 10, 2013 | August 21, 2014 | February 6, 2015 |
| July 9, 2013 | October 6, 2014 | May 8, 2015 |
| August 9, 2013 | November 7, 2014 | June 30, 2015 |
| August 15, 2013 | December 9, 2014 | July 10, 2015 |
| August 15, 2013 | December 9, 2014 | August 11, 2015 |
| | | August 25, 2015 |
| | | September 23, 2015 |
| | | October 26, 2015 |
| | | December 21, 2015 |
| | | December 28, 2015 |

275.    Since the Plaintiff continued to make monthly payments even when he fell behind and

continuously occupied the home, these inspections were not necessary to protect the lender's interest in

the property and were merely conducted to generate additional fees and more float income for Wells

Fargo.

CLASS ACTION COMPLAINT

kh@khudsonlaw.com

276.    In addition, after the Plaintiff missed payments on his mortgage he was also continuously charged excessive late fees in the months following the missed payment regardless of the fact that the Plaintiff continued to make payments every month after the missed payment.

277.    The Plaintiff's payment history reflects the assessment of wrongfully charged late fees, which are too numerous to list herein and wrongfully charged inspection fees for the years prior to 2013.

## RICO ALLEGATIONS

## THE ENTERPRISE

278.    Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).

279.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that will be referred to herein as the "Wells Fargo Enterprise": (1) Wells Fargo, and (2) vendors, including First American Real Estate Information Services, Inc., Fidelity National Financial, Inc., and Mortgage Contracting Services, LLC, which conducted the property inspections billed to Plaintiff and Class Members complained of herein and Black Knight, Inc., Wells Fargo's mortgage servicing vendor in Jacksonville, Florida who provided the computer software for mortgage modifications.

280.    The Wells Fargo Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

281.    The Members of the Wells Fargo Enterprise function as a continuing unit and share the common purpose of maximizing their profits by charging Plaintiff and Class Members improper fees and illegally denying mortgage modifications via MSP computer miscalculations of legal fees and net present value.

282.    The Wells Fargo Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Defendant Wells Fargo and the vendors that perform property inspections.  The Fidelity MSP computer system is a common

communication network by which Wells Fargo and these vendors share information. This common communication network allowed Defendant to charge Plaintiff and Class Members improper inspection fees and to exchange the resulting profits, including fees and profits from illegally denied mortgage modifications and computer miscalculations of legal fees and net present value.

283. While all participate in and are Members and part of the Wells Fargo Enterprise, they also have an existence separate and distinct from the enterprise.

284. They control, operate, and direct the affairs of the Wells Fargo Enterprise by, among other things, programming their computer system to automatically generate work orders for improper property inspections that instruct vendors to conduct inspections; sending out vendors to inspect the property; arranging for vendors to upload completed electronic reports of the property inspections directly into the automated system; assessing fees to borrowers for property inspections on monthly mortgage statements; concealing the nature of the property inspection fees on monthly mortgage statements; collecting payments from borrowers that include inspection fees; and paying vendors for each property inspection completed using funds received from borrowers; denied mortgage modifications via MSP computer miscalculations of net present value.

285. The Wells Fargo Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which they all engage.

## PREDICATE ACTS

286. Section, § 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud) and Fla. Stat. Section 454.23 (2012) regarding the unauthorized practice of Florida law, a felony of the third degree. As set forth below, Defendants have engaged and continued to engage in conduct violating each of these laws to effectuate their scheme.

## VIOLATIONS OF 18 U.S.C. § 1341 AND 18 U.S.C. § 1343

287.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to agreements, monthly mortgage statements, correspondence, checks, inspection reports, appraisals and mortgage modification denial letters.

288.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, including but not limited to agreements, monthly mortgage statements, correspondence, wire transfers, and inspection reports, appraisals and made or caused to be made false statements over the telephone, facsimile, electronic mail, and internet, including falsely denying mortgage modification requests.

289.    The matter and things sent by Defendants via the Postal Service, commercial carrier, wire, or other interstate electronic media included, inter alia: agreements, monthly mortgage statements, correspondence, payments and inspection reports, appraisals and modification denial letters and correspondence regarding the unauthorized practice of law in Florida foreclosure case.

290.    Other matter and things sent through or received via the Postal Service commercial carrier, wire, or other interstate electronic media by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

291.    The monthly mortgage statement received by Plaintiffs and Class Members detail the amounts due on their loans. By issuing mortgage statements to Plaintiff and Class Members, Wells Fargo represented to the Plaintiff and Class Members that all amounts due on these statements were lawful and appropriate charges. Therefore, Defendants misrepresented to Plaintiff and Class Members in

their monthly mortgage statements that all fees, charges and amounts due were lawful and proper. Defendants also concealed improper inspection fees as "other charges" on Plaintiff and Class Members' mortgage statements. Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiff and the Members of the Class and obtaining their property for Defendants' gain.

292.    Because this is a class action, and there were numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiff to plead all details of the scheme with particularity. Therefore, Plaintiff cannot plead the precise dates of all of Defendants' uses of the U.S. mail and interstate wire facilities, and corresponding acts of mail and wire fraud, as this information cannot be alleged without access to Defendants' records.

293.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiff and the Class relied upon the misrepresentations and omissions. Had the Plaintiff and Class Members known the truth that these improper charges and inspection fees were a profit center for Wells Fargo rather than a mechanism to protect any interest in the property, they would not have paid the improper charges.

294.    As a result, Defendants have obtained money and property belonging to the Plaintiff and Class Members and Plaintiff and the Class Members have been injured in their business or property by the Defendants' overt acts of mail and wire fraud.

## PATTERN OF RACKETEERING ACTIVITY

The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years. Wells Fargo also engaged in the unauthorized practice of law in Plaintiff's foreclosure case. In fact, each of the Defendants has committed thousands of acts of racketeering activity. Each act of racketeering activity was related, had a similar

purpose, involved the same or similar vendors and method of commission, had similar results and impacted similar victims, including Plaintiff and Class Members.

295.    The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## RICO VIOLATIONS

296.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..."

297.    Through the patterns of racketeering activities outlined above, the Defendants have also conducted and participated in the affairs of the Wells Fargo Enterprise.

298.    Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the Wells Fargo Enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud and the unauthorized practice of Florida law and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

## SUBCLASS ACTION ALLEGATIONS

299.    Plaintiff brings this action on his own and on behalf of a nationwide RICO SubClass defined as all persons who opted out previously and who were charged MSP computer-generated fees by wells Fargo as a result of a late payment of their mortgage and denied a mortgage modification because of a faulty MSP computer program under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

300.    Excluded from the. SubClass are Defendants, any entity in which a Defendant has a controlling interest or is a parent or subsidiary of, or any entity that is controlled by a Defendant, and

1  any Defendants' officers, directors, employees, affiliates, legal representatives, heirs, predecessors,

2  successors, and assigns.

3      301.    Plaintiff does not know the exact sizes or identities of the individuals included in the

4  proposed SubClass since such information is in the exclusive control of Defendants but Plaintiff believes

5  that the proposed SubClass encompasses the 215 individuals who opted out of the previous RICO

6

7  litigation and are geographically dispersed throughout the United States. Therefore, the proposed

8  SubClass is so numerous that joinder of all Members is impracticable.

9      302.    All Members of the SubClass have been subject to and affected by the same practices and

10  policies described herein. There are questions of law and fact that are common to the SubClass, and

11  predominate over any questions affecting only individual Members of the SubClass. These questions

12  include, but are not limited to the following:

13

14          a.      The nature, scope and operations of Defendants' wrongful policies;

15          b.      Whether Defendants have engaged in mail and wire fraud and the unauthorized

16  practice Florida law;

17          c.      Whether Defendants engaged in a pattern of racketeering activity;

18          d.      Whether the Wells Fargo Enterprise is an enterprise within the meaning of 18

19  U.S.C. § 1961(4);

20          e.      Whether Defendants conducted or participated in the affairs of the Wells Fargo

21

22  Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

23          f.      Whether Wells Fargo had a policy and practice of fraudulently charging persons

24  in arrears unlawful and unreasonable inspection fees;

25          g.      Whether the Court can enter declaratory and injunctive relief; and

26          h.      The proper measure of damages.

27

28

CLASS ACTION COMPLAINT
                                                                    kh@khudsonlaw.com

303.    The claims of the named Plaintiff are typical of the claims of the SubClass and do not conflict with the interests of any other Members of the SubClass in that both the Plaintiff and the other Members of the SubClass were subject to the same wrongful policies and practices by Wells Fargo.

304.    The individually named Plaintiff will fairly and adequately represent the interests of the proposed SubClass. He is committed to the vigorous prosecution of the SubClass' claims and will retain an attorney who is qualified to pursue this litigation and has experience in class actions.

305.    The prosecution of separate actions by individual Members of the SubClass would create a risk of adjudications with respect to individual Members of the SubClass which would, as a practical matter, be dispositive of the interests of other Members of the SubClass who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

306.    The prosecution of separate actions by individual Members of the SubClass would create a risk of inconsistent or varying adjudications with respect to individual Members of the SubClass which would establish incompatible standards of conduct for the parties opposing the SubClass. Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow to exist inconsistent and incompatible rights within the Plaintiff Class.

307.    The Defendants have acted or refused to act on grounds generally applicable to the SubClass making final declaratory or injunctive relief appropriate.

308.    The questions of law and fact common to Members of the SubClass predominate over any questions affecting only individual Members.

309.    Notice to the propose SubClass can be achieved through the U.S. mail to the addresses of the Class Members that are kept within Defendants' records. Notice can also be supplemented via publication.

310.    A Class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

      a.    Individual claims by the Class Members are impractical as the costs of pursuit far exceed what any one individual Plaintiff has at stake.

      b.    As a result, individual Members of the Class have no interest in prosecuting and controlling separate actions.

      c.    It is desirable to concentrate litigation of the claims herein in this forum.

      d.    The proposed Class action is manageable.

## CAUSES OF ACTION

### VIOLATION OF RICO 18 U.S.C. § 1962(c)

311.    Plaintiff incorporates and realleges the paragraphs above as if fully set out herein.

312.    This claim for relief arises under 18 U.S.C. § 1964(c).

313.    As set forth above, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the Wells Fargo Enterprise through a pattern of racketeering.

314.    As a direct and proximate result, Plaintiff and Class Members have been injured in their business or property by both the predicate acts which make up the Defendants' patterns of racketeering activity.

315.    Specifically, Plaintiffs and Class Members have been injured in their business or property in a variety of ways, including paying unlawful and unreasonable inspection and late fees and being denied mortgage modifications because of a faulty computer program.

### VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200, ET SEQ.

316.    Plaintiff incorporates and reallege the paragraphs above as if fully set out herein.

CLASS ACTION COMPLAINT

kh@khudsonlaw.com

317.    As set forth above, Defendants' scheme included making false and misleading

representations to Plaintiff and other Members of the SubClass of borrowers, which constitutes

unlawful, unfair and fraudulent business practices under the UCL.

318.    Specifically, Plaintiff and the SubClass Members have been injured in their business or

property by paying for repeated drive-by inspections and improper late fees, which were unlawful and

unreasonable and denied mortgage modifications via a faulty computer program.

319.    Plaintiff claims involve questions of common and general interest.

320.    Plaintiff and SubClass Members have suffered losses of money as a result of Defendants'

unlawful, deceptive and unfair business practices through the payment of fees and mortgage

modification denials. As a result, of Defendants' violations of the UCL, Plaintiff and Members of

SubClass are entitled to bring this claim for disgorgement and to recover restitution, reasonable

attorneys' fees, and costs and other injunctive or declaratory relief as may be available.

## PRAYER FOR RELIEF/NINTH CAUSE OF ACTION/RICO

WHEREFORE, Plaintiff demand judgment against Defendants as follows:
       a.       Certification of the RICO SubClass pursuant to Rule 23 of the Federal Rules of

Civil Procedure, certifying Plaintiff as the representative of the Class, and designating his counsel as

counsel for the SubClass;

       b.       A declaration that Defendants have committed the violations alleged herein;

       c.       An award of treble the amount of damages suffered by Plaintiff and Members of

the SubClass as proven at trial plus interest and attorneys' fees and expenses pursuant to 18 U.S.C. §

1962(c) and (d);

       d.       An award of damages suffered by Plaintiff and SubClass Members pursuant to the

provisions of California's consumer protection law identified above;

CLASS ACTION COMPLAINT
                                                                                                         kh@khudsonlaw.com

1          e.      Ordering Defendants to disgorge the payments and profits they wrongfully

2   obtained at the expense of Plaintiff and SubClass Members;

3          f.      Ordering that an accounting be made by Defendants of their wrongfully obtained

4   payments and profits;

5
          g.      An injunction to prevent Defendants from engaging in future fraudulent practices;
6

7          h.      Costs of this action, including reasonable attorneys' fees and expenses; and

8          i.      Any such other further legal or equitable relief that this Court deems just and

9   proper.

10

11

12

13

14

15

16

17

18                                                                      .

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
                                                                            kh@khudsonlaw.com

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury on all claims so triable as a matter of right.

3

DATED: _10/20/21_

4

5

Respectfully submitted,

6

7

8

9

10

Dated: /s/ _Kurt L. Hudson_ 10/20/21

11

Kurt L. Hudson

12

441 E. 87th Place
Chicago, IL 60619

13

Telephone: 312-391-3339
kh@khudsonlaw.com

14

Pro Se Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

kh@khudsonlaw.com